**In re Quinton Ray DODD & Vickie E. Dodd, Debtors.**

**Lonnie D. ECK, Trustee, Plaintiff,**

**v.**

**USA PROPERTY COMPANY and Vickie E. Dodd, Trustee of the Quinton R. Dodd Family Trust, Quinton R. Dodd and Vickie E. Dodd, Defendants.**

**Bankruptcy No. 88–00282–C.
Adv. No. 88–0253–C.**

United States Bankruptcy Court,
N.D. Oklahoma.

Feb. 15, 1989.

Judi E. Beaumont, Tulsa, Okl., for plaintiff.

Mark A. Craige, Tulsa, Okl., for defendants.

## MEMORANDUM DECISION AND ORDER

STEPHEN J. COVEY, Bankruptcy Judge.

On January 23, 1989, the Court heard the Trustee's action, brought pursuant to 11 U.S.C. § 544(b) and 24 O.S.1986 § 112 et seq., to avoid alleged fraudulent transfers by Debtors. After considering the evidence presented and the arguments and authorities of counsel, the Court finds as follows:

Debtors filed their petition seeking relief under Chapter 13 of the Bankruptcy Code on February 9, 1988, and the case was converted to a Chapter 7 case on April 6, 1988.

Under 11 U.S.C. § 544(b), the Trustee may avoid transfers voidable under applicable state or federal law by a creditor in the case holding either an allowable unsecured claim or an unsecured claim not allowable only under § 502(e).

Under § 117(A) of Oklahoma's Uniform Fraudulent Transfer Act ("UFTA"), a transfer made by a debtor is voidable as fraudulent as to a pre-existing creditor if the transfer is made for less than reasonably equivalent value and the debtor was insolvent at that time or became insolvent as a result of the transfer.

Prior to filing bankruptcy, Debtors made the following transfers and received no value in exchange for them: (1) The transfer of $65,000.00 cash to USA Property Company ("USA") from September through December, 1986; (2) The transfer of 500 jointly-owned shares of USA stock, representing 100% ownership of the corporation, to the Quinton R. Dodd Family Trust ("Trust") on December 12, 1986; and (3) The transfer of $27,049.54 cash to the Trust on August 28, 1987. It is undisputed that Oklahoma law applies to these transfers

The only issues before the Court are: (1) Whether Debtors were insolvent at the time of the transfers or became insolvent as a result of the transfers; and (2) Whether a creditor of Debtors at the time of the transfers could have avoided the transfers under Oklahoma law and this creditor has either an allowable unsecured claim in the bankruptcy case or an unsecured claim not allowable only under § 502(e). If so, the Trustee may avoid the transfers under 11 U.S.C. § 544(b) and § 117(A) of the UFTA.

The Trustee has the burden of proving insolvency. *Georgia Pacific Corp. v. Lumber Products Co.*, 590 P.2d 661 (Okla. 1979).[1] However, Oklahoma law is unclear as to the standard of proof on insolvency.[2] The Trustee maintains that the applicable standard is proof by a preponderance of the evidence, while Defendants state that it is proof by clear and convincing evidence. It is unnecessary to decide this legal issue because the Court finds that the Trustee's proof meets both standards.

Under § 114 of the UFTA, a debtor is insolvent if the sum of the debtor's debts exceeds the debtor's assets at a fair valuation. Using this test, for the reasons set forth below, the Court finds that Debtors were rendered insolvent on December 12, 1986, when they transferred ownership of USA to the Trust. Thereafter, Debtors

---

1. That case construed the burden of proof under former § 104 of Oklahoma's Uniform Fraudulent Conveyances Act, repealed and amended by § 117(A) of the UFTA. Because of the similarity between the two statutory provisions, the Court does not believe that the Oklahoma legislature, in enacting § 117(A) of the UFTA, intended to alter the burden of proof on insolvency established by Oklahoma case law under former § 104. Furthermore, the Court finds no rationale requiring a different burden of proof under § 117(A) of the UFTA.

2. No Oklahoma cases construe the standard of proving insolvency under § 117(A) of the UFTA or its similar predecessor, § 104 of the former Oklahoma Uniform Fraudulent Conveyances Act. Two cases construing a distant predecessor statute, § 9697, O.S.1931, are anything but clear as to the standard of proving insolvency. *Levinson v. Glidden*, 169 Okla. 546, 37 P.2d 924 (1934); *Foster v. Shirley*, 170 Okla. 373, 40 P.2d 1083 (Okla.1935). The Court recognizes that some courts in other jurisdictions, construing the Uniform Fraudulent Conveyances Act, have held that the proper standard is proof by clear and convincing evidence. *First Nat'l Bank in Albuquerque v. Abraham*, 97 N.M. 288, 639 P.2d 575, 579 (1982); *Furniture Mfrs. Sales, Inc. v. Deamer*, 680 P.2d 398, 400 (Utah 1984).

remained insolvent through the date they filed their petition herein.[3]

It is undisputed that, after the transfer of USA stock on December 12, 1986, Debtors' only possible assets were as follows: (1) 50% of the stock of Lakeland Real Estate Development, Inc. ("Lakeland"); (2) 50% of the stock of DSH Interiors, Inc. ("DSH"); and (3) 50% ownership of the Dodd and Henry Partnership ("Partnership"). Accordingly, the Court must determine the fair value of these assets.

Lakeland was in the business of developing an 80–acre mixed residential/commercial project on Lake Hudson in Mayes County, Oklahoma. The project was financed by Phoenix Federal Savings & Loan Association ("Phoenix") which had a first mortgage on the project. By December of 1986, Lakeland had partially completed development of the first 40 acres, but had not obtained sufficient financing to complete the project. The project was not producing a positive cash flow and was on the verge of collapse due to the downturn in the Oklahoma economy. The fair value of the project, Lakeland's sole asset, was approximately $4 million on December 12, 1986. Lakeland owed Phoenix approximately $5.1 million at this time. Debtors' ownership interest in a corporation with negative net worth and cash flow must be valued at zero, in the absence of any evidence that the stock otherwise had a market value.

DSH operated a carpet business with locations in Tulsa, Pryor and Claremore, Oklahoma. DSH leased the store buildings in Pryor and Claremore, but owned the building in Tulsa. DSH's sole assets were the store inventory, equipment, and accounts and the building in Tulsa. On December 12, 1986, the fair value of DSH's store inventory, equipment, and accounts for all locations was approximately $50,000.00. At that time, the Bank of Oklahoma, Pryor ("BOK"), held a first lien on such inventory, equipment, and accounts securing an indebtedness on two notes

from DSH in the amount of approximately $235,000.00. On December 12, 1986, the fair value of the real estate and store building in Tulsa was between $500,000.00 and $790,000.00. Phoenix held a first mortgage on this property securing an indebtedness of approximately $640,000.00 at that time. DSH had not paid the rent owing on the leases of the Pryor and Claremore stores for some months. The Court infers from this that the stores were not producing a positive cash flow on December 12, 1986. Accordingly, the fair value of Debtors' ownership interest in a corporation with dubitable net worth and cash flow must be zero, in the absence of any evidence that the stock otherwise had a market value.

The Partnership owned the store buildings in Pryor and Claremore which were leased to DSH in December of 1986. As stated above, DSH was not making rent payments at this time. The fair value of these properties was at most approximately $240,000.00. Phoenix held a first lien on the properties securing an indebtedness of approximately $162,000.00. Another party held a second lien on the properties securing an indebtedness in the amount of approximately $51,000.00. Thus, Debtors 50% interest in this partnership had a maximum fair value of approximately $13,500.00.

Therefore, the Court finds that the fair value of all Debtors' assets was approximately $13,500.00 on December 12, 1986.

The Court must next determine the amount of Debtors' debts on December 12, 1986. Under § 113(5) of the UFTA, "debt" means "liability on a claim". Under § 113(3) of the UFTA, a claim includes a right to payment "whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Under § 114(E) of the UFTA, a debt does not include an obligation "to the extent it is

**3.** The Court need not immediately address whether Debtors were insolvent from September through December, 1986, when they transferred $65,000.00 to USA. The issue becomes moot if the Court finds that the Trustee is entitled to recover the transfer of 100% ownership of USA on December 12, 1986.

secured by a valid lien on *property of the debtor* not included as an asset."

On December 12, 1986, Debtors had each co-signed the note from Lakeland to Phoenix and thus each had a debt to Phoenix in the amount of approximately $5.1 million.[4] In addition, Mr. Dodd had debts based on numerous personal guaranties, but the Court need not discuss these debts.

Therefore, the Court finds that Debtors were insolvent on December 12, 1986 because they had debts of at least $5.1 million and assets of a fair value of only $13,500.00. Furthermore, the Court finds that Debtors remained insolvent until the filing of bankruptcy.

■ The only remaining issue is whether an unsecured creditor in this case could have avoided the transfers under Oklahoma law. The Court finds that on December 12, 1986, Phoenix was a creditor of Debtors and could have brought suit under § 117(A) of the UFTA. Furthermore, Phoenix is a creditor in this bankruptcy case with an allowable claim of over $5 million which is largely unsecured.[5]

Therefore, under 11 U.S.C. § 544(b) and 24 O.S.1986 § 112 et seq., the Court finds that the Trustee may avoid Debtors' fraudulent transfers of USA stock and $27,049.54 to the Trust.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Trustee is entitled to recover the USA stock and $27,049.54 from the Trust and the Trust is ordered to transfer this property to the Trustee.

---

**4.** This note was secured by property of Lakeland, not property of Debtors. Therefore the value of the security is not deducted to determine the amount of the debt to Phoenix. Even if the value of the security were deducted, the debt to Phoenix would be approximately $1.1 million.

**5.** The Court takes judicial notice of the claim filed in this case by Phoenix. The Court also takes judicial notice of the terms of Debtors' proposed Chapter 13 Plan, which stated that Phoenix's claim was largely unsecured.