**In re James Milton SOLOMON and Carla D. Solomon, Debtors.**

**Stillwater National Bank and Trust Company, Plaintiff,**

**v.**

**Scott Kirtley, Trustee, Defendant.**

**Bankruptcy No. 01–04480–M.**
**Adversary No. 02–0057–M.**

United States Bankruptcy Court, N.D. Oklahoma.

Jan. 9, 2003.

Jared D. Giddens, Bryan J. Wells, Oklahoma City, OK, for plaintiff.

Scott P. Kirtley, Tulsa, OK, for defendant.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Bankruptcy Judge.

THIS MATTER came before the Court for trial on October 24, 2002. Plaintiff Stillwater National Bank and Trust Company ("Bank") appeared by and through its attorneys, Bryan Wells and Jared D. Giddens. Defendant Scott Kirtley, Trustee ("Kirtley" or "Trustee") appeared *pro se* and with co-counsel, Richard Garren.

The Court received evidence from the parties. The Court also considered the facts stipulated to by the parties in the Pre-Trial Order filed in this action on October 11, 2002. Closing argument was submitted in the form of post-trial briefs, the last of which was received November 21, 2002. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(I).

## Findings of Fact

Debtors, James and Carla Solomon (the "Debtors"), were the sole shareholders of Sabre International Inc. ("Sabre"), a closely held corporation formed in the late 1980s. Sabre was engaged in the business of distributing parts and supplies as well as making custom alterations to heavy machinery used in the pipeline construction industry. Sabre operated its business on certain real property (the "Commercial Property") which it leased from the James M. Solomon and Carla D. Solomon Revocable Living Trust Dated January 13, 1995 (the "Trust"). Debtors created the Trust as part of their estate plan. The Commercial Property consisted of three tracts of land. According to James Solomon, the Commercial Property had a fair market value of approximately $2.1 million in 2000. At all relevant times, the Commercial Property was subject to mortgages held by Gold Bank ("Gold").

Bank has been the principal operating lender for Sabre since 1995. At all relevant times, Sabre's debt to the Bank was secured by blanket liens upon Sabre's equipment, inventory, and all other assets of the company. In addition, the Bank has held a pledge of all of the voting stock of Sabre. Since at least February of 1995, Debtors and the Trust have personally guaranteed all of the obligations of Sabre to the Bank. These guarantees were unconditional, and allowed the Bank to pursue the Debtors directly for the payment of Sabre's debt.[2]

As of March 30, 2000, the obligations of Sabre to the Bank were in the sum of $8,833,220.56. At that time, Sabre was experiencing financial difficulty due to a downturn in the worldwide pipeline construction market and was in default of its obligations to the Bank. Sabre began talking with asset-based lenders about the possibility of refinancing its current loans. Sabre also talked with Bank and its other current lenders about restructuring debts

---

**1.** Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2003).

**2.** The guarantees that the Debtors signed in regard to Sabre's debt stated in pertinent part:

 D. This Guarantee Agreement shall be absolute, unconditional and continuing guarantee of payment and not of collection and shall be binding upon the undersigned, heirs or successors of the undersigned, and the estate or estates of the undersigned .... This Guarantee Agreement is an independent obligation which is separately enforceable from the obligation of the Debtor.

 E. All rights of the Lender are cumulative and not alternative to other rights. Suit may be brought against the undersigned or other parties liable, jointly and severally, and against any one or more of them, and against all or less than all, without impairing the rights of the Lender, its successors or assigns, against others of the undersigned....

*Pl.'s Ex. 1.*

and payment schedules to ease some of the financial problems it was experiencing.

On March 31, 2000, Debtors, Sabre, the Trust and the Bank agreed to restructure a portion of Sabre's obligations to the Bank. Under the terms of the restructure, Sabre executed and delivered a promissory note to the Bank in the principal amount of $350,000.00. The note was due and payable in full on April 30, 2000, one month after its execution.[3] Debtors and the Trust executed new unconditional guarantees of this obligation.[4] Bank did not advance any new funds to Sabre; instead, it applied the loan "proceeds" to the accrued interest on the existing debt, with the remaining amount applied to principal.[5] Additionally, the Debtors, through their Trust, granted the Bank a mortgage on one tract of the Commercial Property, which was properly recorded by the Bank on April 27, 2000. The mortgage operated to secure only the $350,000 [N]ote. Although this restructure arguably had the effect of bringing Sabre current on its loans with the Bank for a one month period, it did not reduce the obligations of either Sabre or the Debtors to the Bank. The only reduction in the debt owed to the Bank came about as a result of a payment by Sabre in the approximate amount of $10,000.00. The restructure did not cure any of Sabre's financial ills. The records of the Bank reflect that Sabre continued to overdraft its corporate checking accounts, and that several checks were dishonored by the Bank due to insufficient funds.[6]

James Solomon testified as to Debtors' financial condition as of March 31, 2000. The Court received into evidence a balance sheet for the Debtors showing assets of $2,947,900 and liabilities of $10,823,000 as of March 31, 2000.[7] Mr. Solomon testified that this balance sheet provided an accurate picture of his financial condition on the date specified, and that no significant improvement occurred between March 31, 2000, and September 29, 2000. In response, the Bank offered as exhibits two

---

**3.** *See Pl.'s Ex. 3.*

**4.** Each of these new guarantees contained the following provision:

PRIMARY LIABILITY. I am primarily liable under this guaranty, regardless of whether or not you [Bank] pursue any of your remedies against the Borrower [Sabre], against any other maker, surety, guarantor or endorser of the Debt or against any Property. You may sue me alone, or anyone else who is obligated on this Guaranty, or any number of us together, to collect the Debt. My liability is not conditioned on the signing of this Guaranty by any other person and further is not subject to any condition not expressly set forth in this Guaranty or any instrument executed in connection with the Debt. My obligation to pay according to the terms of this Guaranty shall not be affected by the illegality, invalidity or unenforceability of any notes or agreements evidencing the Debt, the violation of any applicable usury laws, forgery, or any other circumstances which make the Debt unenforceable against the Borrower. I will re-

main obligated to pay on this Guaranty even if any other person who is obligated to pay the Debt, including the Borrower, has such obligation discharged in bankruptcy, foreclosure, or otherwise discharged by law.
*Pl.'s Ex. 4.*

**5.** In its trial brief, the Bank implies that the application of loan "proceeds" was done "at the Debtors' behest." *See [Pl.'s] Trial Brief* at 10. There is no evidence in the record to support such a statement. The testimony of the loan officer responsible for the transaction suggests that the amount and terms of the restructure, as well as the application of the "proceeds," were matters determined by the Bank. One is hard pressed to understand why, if the Debtors had control of the terms of the March 31, 2000 promissory note, they would have desired that the entire amount of the note be due and payable in one month.

**6.** *See Def.'s Exs. 10 and 11.*

**7.** *See Def.'s Ex. 28.*

financial statements delivered to the Bank by the Debtors on December 31, 1999, and June 30, 2000.[8] Each of these exhibits shows the Debtors with a positive net worth of between $2.5 and $3 million; however, neither of these financial statements includes the Debtors' liability to the Bank by virtue of their guaranty of Sabre's indebtedness to the Bank. On the basis of the evidence before it, the Court finds that Debtors' liabilities exceeded their assets on March 30, 2000, and September 29, 2000.

The summer of 2000 brought with it no changes in the fortunes of Sabre. It again fell in default on its obligations to the Bank, and its total debt to the Bank grew to in excess of nine million dollars. No other lenders came forward to provide Sabre with funds. On September 29, 2000, the parties agreed to a second restructure of Sabre's debt. Under the terms of the restructure, Debtors and the Trust executed and delivered to the Bank a new promissory note in the sum of $612,721.42.[9] As security for the note, the Bank asked for, and received, an additional mortgage on all three tracts of the Commercial Property owned by the Trust. Not only did the mortgage secure the monies identified in the note, it also purported to secure "any other indebtedness of the Mortgagor [Debtors and the Trust] to the Mortgagee [Bank]."[10] The Bank recorded the mortgage on October 18, 2000. Once again, no new money was advanced by the Bank; instead, Bank credited the "loaned" funds to accrued interest and principal on the debt owed by Sabre to the Bank. The note

executed on March 31, 2000, was satisfied in its entirety.

After this restructure, Sabre's direct debt was reduced to $8,865,686.42. This amount, as noted above, was secured by Sabre's equipment, inventory, and all other assets of the corporation; as well as the stock pledge of the Debtors and the personal guarantees of the Debtors and the Trust. The Debtors and the Trust, both guarantors of the Sabre obligations, were now independently liable for $612,721.42. No money changed hands. In addition, none of the obligations of Sabre, Debtors or the Trust were changed significantly. This can best be illustrated by looking at the Bank debt before and after each restructure:

**March 30, 2000:**

| | |
|---|---|
| Debt owed by Sabre: | $8,833,220.56 |
| Amount guaranteed by Debtors: | $8,833,220.56 |
| Amount guaranteed by Trust: | $8,833,220.56 |

**March 31, 2000:**

| | |
|---|---|
| Debt owed by Sabre: | $8,833,220.56 |
| Amount guaranteed by Debtors: | $8,833,220.56 |
| Amount guaranteed by Trust: | $8,833,220.56 |

**September 29, 2000:**

| | |
|---|---|
| Debt owed by Sabre: | $9,476,375.80 |
| Amount guaranteed by Debtors: | $9,476,375.80 |
| Amount guaranteed by Trust: | $9,476,375.80 |

**September 30, 2000:**

| | |
|---|---|
| Debt owed by Sabre: | $8,865,686.32 |
| Amount guaranteed by Debtors: | $8,865,686.32 |
| Amount guaranteed by Trust: | $8,865,686.32 |
| Debt owed by Debtors and Trust: | $ 612,721.42 |
| Total liability of Debtors and Trust: | $9,478,427.74 [11] |

The Court concludes that the main purpose of these restructures was to allow the Bank to encumber the Commercial Property.

Although Debtors were able to make the monthly payments on the $612,721.42 note from the rents they received from Sabre for the lease of their Commercial Property, Sabre fell into default on its obligations

8. *See Pl.'s Exs. 17 and 18.*

9. *See Pl.'s Ex. 6.*

10. *Pl.'s Ex. 7, ¶ 1.4.*

11. The Court acknowledges that these numbers are not exactly equal. The Court's calculations are based upon evidence supplied by the Bank. While the reason for the discrepancy is unclear, what is clear is that the obligations of the Debtors and the Trust were not materially affected by either of the restructures.

to the Bank shortly after September 29, 2000.[12] Litigation ensued, and the Bank sought and obtained a receiver for Sabre in a judicial proceeding filed in the District Court in and for Tulsa County, Oklahoma. On October 3, 2001, the Debtors filed for Chapter 7 bankruptcy relief. The next day, the Bank, holding a proxy of the shares of Sabre, forced the corporation into Chapter 11 bankruptcy reorganization. After his appointment as trustee in the Debtors' case, Mr. Kirtley took control of the Trust and consolidated its assets into the Debtors' bankruptcy estate.

In their bankruptcy schedules, the Debtors listed debts totaling more than four million dollars and assets totaling almost three million dollars. Of those debts, $2,102,493.00 was classified as unsecured, nonpriority debt.[13] With the exception of one or two of the unsecured debts, all had been in existence prior to March of 2000.

The Debtors' assets consisted of personal and real property with the corporate stock of Sabre and the Commercial Property being the only nonexempt assets subject to liquidation. It is apparent from Sabre's financial statements that the stock held by the Debtors had no monetary value.[14] The value of the Commercial Property listed in their schedules was estimated at $2,000,000.[15] The schedules reflect that the Commercial Property is encumbered by two mortgages originally given in favor of Gold and, as previously discussed, the two mortgages granted in favor of the Bank. The first mortgage of Gold, covering the first tract of the Commercial Property, amounts to $55,640.61. The second mortgage of Gold, covering the second tract of the Commercial Property, amounts to $1,315,511.00. The Gold mortgages have been acquired by the Bank; their priority is not in dispute. The September 29, 2000[,] mortgage given to the Bank covered all three tracts of the Commercial Property.[16] If the mortgages obtained by the Bank in 2000 are valid, the parties agree that there is little, if any, equity in the Commercial Property. If those mortgages are set aside, liquidation of the Commercial Property by the Trustee has the potential to generate funds for distribution to unsecured creditors.

### Burden of Proof

The Trustee seeks to avoid the mortgages taken by the Bank on the Commercial Property as fraudulent transfers under both federal and state law.[17] Under § 548, the burden of proof is on the trustee to establish each element of a fraudu-

---

12. Indeed, Ms. Carol Kinzer, the Bank officer responsible for servicing the Sabre debt from February of 2000 to the time of trial, testified that during that time period, there had never been a time when Sabre was not in default of its obligations to the Bank.

13. The Debtors, while listing other guarantees of Sabre's debts in their schedules, failed to list their guarantees to the Bank, which as noted above, totaled in excess of eight million dollars. At trial, James Solomon testified that the guarantee was not included in the schedules because it was his belief that the Bank was a secured creditor in his bankruptcy. While the record is silent regarding the status of those guarantees, it is clear that at the time of transferring the mortgages to the Bank, the Debtors personally owed the Bank over eight million dollars under their guarantees.

14. See Def.'s Ex. 12 (stockholders equity in Sabre was ($1,531,324.00) as of June 30, 2000).

15. See Def.'s Ex. 19.

16. These mortgage amounts (both Gold's and the Bank's) include the principal and interest that had accrued up until August 20, 2002, which was the day of the hearing regarding the Bank's motion for relief from stay and abandonment of the encumbered real property.

17. See § 548 and § 544(b).

lent transfer by a preponderance of the evidence.[18] Under Oklahoma's version of the Uniform Fraudulent Transfer Act (the "UFTA"), the burden of proof is on the creditor to prove the elements of a fraudulent transfer.[19] Oklahoma law is silent regarding the standard of proof required.[20] When federal courts interpret a state statute as a matter of first impression, they must, as best they can, predict how the state's highest court would interpret it.[21] Oklahoma courts are directed to interpret the UFTA in a manner that makes it uniform among states that have enacted it.[22] Many states have determined that the proper standard of proof under the UFTA is the preponderance of evidence standard.[23] It is reasonable to presume that the Oklahoma Supreme Court would follow their lead. Thus, the preponderance of the evidence standard will be applied for the Court's analysis of the transfers under the UFTA as well.

## Conclusions of Law

 The policy behind the UFTA and § 548 is. to preserve assets of the estate for the benefit of creditors.[24] The language of the UFTA and § 548 are nearly identical; the only significant difference being a longer statute of limitations under Oklahoma law.[25] Many courts, considering the similarities in purpose and language, have concluded that the UFTA and § 548 are *in pari materia*, and that the same analysis applies under both laws.[26] The Court finds the reasoning behind these cases to be persuasive. As such, the transfers will only be analyzed under the purview of § 548, with an eye towards Oklahoma's four year statute of limitations.[27]

Under § 548, a transfer that was made within one year of the bankruptcy petition is constructively fraudulent if a debtor

**18.** See *Kaler v. Craig (In re Craig)*, 144 F.3d 587, 590 (8th Cir.1998); *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997); 5 Collier on Bankruptcy ¶ 548.10, at p. 548–80 (Lawrence P. King ed., 15th rev. ed.1998); *Burdick v. Lee*, 256 B.R. 837, 840 (D.Mass.2001); *Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 573 (Bankr. N.D.Cal.1994).

**19.** See *Eck v. USA Property Co. (In re Dodd)*, 97 B.R. 74, 75 (Bankr.N.D.Okla.1989).

**20.** *Id.*

**21.** *Johnson v. Riddle*, 305 F.3d 1107, 1118–19 (10th Cir.2002).

**22.** See Okla. Stat. Ann. tit. 24 § 123 (West 1987).

**23.** See, e.g., *Prairie Lakes Health Care System, Inc. v. Wookey*, 583 N.W.2d 405, 411 (S.D. 1998) and *Morris v. Nance*, 132 Or.App. 216, 888 P.2d 571, 576 (1994).

**24.** See *Mather v. Clancy (In re Honey Creek Entertainment, Inc.)*, 246 B.R. 671, 687 (Bankr.E.D.Okla.2000), *rev'd on other*

grounds, 37 Fed.Appx. 442 (10th Cir.2002) (citing Oklahoma law) and *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir.1991).

**25.** *Compare* § 548(a)(B)(i) and (ii) *with* 24 Okla. Stat. [Ann.] tit. 24 § 116(A)(2)(a) (West 1987).

**26.** See *United Energy Corp., supra*, 944 F.2d at 594; *Solow v. Reinhardt (In re First Commercial Management Group, Inc.)*, 279 B.R. 230, 240 (Bankr.N.D.Ill.2002) ("Except for the different statute of limitations, the state and federal statutes are functional equivalents, and the analysis applicable [under federal law] is also applicable [under state law]."); *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D.Ill. 1998) ("Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA."); *cf. Kojima v. Grandote Int'l Limited Liability Co. (In re Grandote Country Club Co., Ltd.)*, 252 F.3d 1146, 1152 (10th Cir.2001).

**27.** See Okla Stat. [Ann.] tit. 24 § 121 (West 1987).

was: (i) "insolvent on the date such transfer was made" and (ii) "received less than a reasonably equivalent value in exchange for" the transfer.[28] The parties do not dispute that the transfers fall within the prescribed statute of limitations (the March 31 transfer being covered under Oklahoma law), but they do dispute whether the Debtors were insolvent or received reasonably equivalent value for the transfers of the mortgages to the Bank.

*Insolvency*

 The Code defines insolvency as a "financial condition such that the sum of such entities debts is greater than all such entities property, at fair evaluation."[29] In order to determine whether a debtor is insolvent, a court must create a balance sheet of a debtor's assets and liabilities. If a debtor's liabilities exceed his assets (exclusive of exempt and fraudulently transferred assets) the debtor will be declared insolvent. "In calculating [a] debtor's balance sheet, the court should consider only those assets readily susceptible to liquidation ... and only those debts that are valid under applicable state and federal law."[30] "For purposes of § 548, [in]solvency is measured at the time the debtor transferred value, not at some later or earlier time."[31]

 At the time of the transfers in question, the Debtors' only nonexempt, liquid assets were the Commercial Property and the corporate stock of Sabre. The Commercial Property, giving the benefit of the doubt on its valuation, was worth a little more than two million dollars. However, after subtracting the valid and enforceable mortgages that were held by Gold Bank (totaling $1,371,150.61), the Commercial Property's realizable value at the time of the transfers was less than $650,000.00. By virtue of their guarantees to the Bank, the Debtors owed the bank in excess of nine million dollars. Under Oklahoma law, this debt is a valid, non-contingent obligation.[32] Moreover, the majority of the Debtors' unsecured debt had been incurred prior to March of 2000, and totaled in excess of two million dollars. As noted above, the corporate stock of Sabre had virtually no value at that time. Thus, at the time of the transfers, the Debtors were insolvent.

*Reasonably Equivalent Value*

 The issue before the Court is not whether the Bank provided the Debtors with value in exchange for the mortgages; as a matter of law, the securing of antecedent debt constitutes value.[33] The question is whether, under the facts of this case, the securing of antecedent debt constitutes "reasonably equivalent value." It is here where the opinions of the parties diverge, and the crux of the dispute lies.

 There are two separate and distinct views on the issue. The first, espoused by the Bank, contends that

---

**28.** § 548(a)(1)(B)(i) and (ii)(I).

**29.** § 101(32)(A).

**30.** *Taylor v. Riverside–Franklin Properties, Inc. (In re Taylor)*, 228 B.R. 491, 501 (Bankr. M.D.Ga.1998) (citations and quotations omitted).

**31.** *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 154 (3rd Cir.1996).

**32.** *See Founders Bank and Trust Co. v. Upsher,* 830 P.2d 1355, 1361 (Okla.1992) (observing that a "guarantor's obligation is collateral to that of the principle debtor or obligor and independently and separately enforceable") (emphasis omitted).

**33.** *See* § 548(a)(2)(A); *see also Anand v. Nat'l Republic Bank of Chicago,* 239 B.R. 511, 517 (N.D.Ill.1999) (hereafter *"Anand II"*).

... as a matter of law collateralizing antecedent debt cannot constitute less than reasonably equivalent value regardless of the value of the collateral. This is so, again, because, from the perspective of the debtor, the value of the interest in the collateral transferred can never be more than the amount of the debt. The value of the collateral is therefore irrelevant to the ultimate question because the excess over the debt is not lost to the debtor or other creditors.[34]

Under this analysis, any time a debtor grants a security interest to secure an antecedent debt, the transaction is immune from attack as a fraudulent conveyance. This position operates to protect the honest (and arguably prudent) lender; under this view, if there were no fraudulent intent on the part of the party receiving the security interest, then the transaction should be free from attack.

The other view, endorsed by the Trustee, suggests that the proper inquiry requires consideration of the effect of the conveyance upon the other creditors of the debtor.

The determination as to whether Debtor received "reasonably equivalent value" for its transfers to Parkway turns on an analysis of the type and/or amount of benefit obtained by the Debtor in return for the transfers. If Debtor's unsecured creditors were (or are) damaged in their ability to collect from Debtor by virtue of Debtor's transfers to Parkway, then the transfers were (and are) fraudulent and may be avoided by the Trustee. As noted by the Seventh Circuit:

In determining whether property was sold for reasonably equivalent value, the bankruptcy court must, of course, be mindful constantly of the purpose of section 548's avoiding powers—to preserve the assets of the estate. This consideration requires that, in determining reasonably equivalent value, the court must focus on what the debtor received in return for what he surrendered.[35]

This view has little concern with the lender who obtained the lien; instead, it requires the court to determine the effect of the transaction on the remaining unsecured creditors of the debtor. Under this view, the Court makes the determination of what constitutes "reasonably equivalent value" on a case by case basis, and there are no situations where "reasonably equivalent value" exists as a matter of law.

This Court has difficulty with the position urged by the Bank. Section 548(a)(2)(A) states that the securing of antecedent debt constitutes value; it does *not* say that the securing of antecedent debt constitutes *reasonably equivalent* value. If Congress had wanted any and all securing of antecedent debt to be free from scrutiny under § 548, it could have so provided in the Bankruptcy Code. Instead, Congress left the determination of "reasonably equivalent value" to the courts. The United States Court of Appeals for the Tenth Circuit as well as our Bankruptcy Appellate Panel have ruled that the determination of "reasonably equivalent value" is a question of fact.[36] The view

---

**34.** *Anand v. Nat'l Republic Bank of Chicago (In re Anand),* 210 B.R. 456, 459 (Bankr. N.D.Ill.1997) (citation omitted) (hereafter *"Anand I"*), *aff'd on other grounds, Anand II, supra.*

**35.** *Leibowitz v. Parkway Bank and Trust Co.,* 210 B.R. 298, 301 (N.D.Ill.1997) (citations omitted), *aff'd sub nom[,] In re Image Worldwide, Ltd.,* 139 F.3d 574 (7th Cir.1998).

**36.** *See Clark v. Security Pacific Business Credit, Inc. (In re Wes Dor, Inc.),* 996 F.2d 237, 242 (10th Cir.1993); *see also Zubrod v. Kelsey (In re Kelsey),* 270 B.R. 776, 779 (10th Cir. BAP 2001)[.]

espoused by the Bank is contrary to these decisions, and eliminates the role of the Court in determining reasonably equivalent value.

The analysis contained in one of the decisions relied upon by the Bank was rejected by the very court which affirmed the decision. In *Anand I*,[37] Judge Barliant made the pronouncement outlined above that "as a matter of law collateralizing antecedent debt cannot constitute less than reasonably equivalent value regardless of the value of the collateral."[38] As it affirmed the decision, the district court rebuffed Judge Barliant's position.

But Judge Barliant did not cite, and the court's research did not uncover, any authority that has held that securing an antecedent debt is always a transfer of reasonably equivalent value. Further, such a *per se* rule would represent a departure for the Seventh Circuit's emphasis on "all the facts of each case" as part of the reasonably equivalent value analysis. So, although the court can find no flaws in Judge Barliant's conclusion that Anand received reasonably equivalent value as matter of law, the court is constrained to consider facts that the bankruptcy court did not.[39]

This Court concludes that the analysis of Judge Barliant is not the law in his own district, and respectfully declines to apply his analysis to the facts of this case.

Many of the other cases relied upon by the Bank are also distinguishable from the present case. Bank cites the case of *In re Kaplan Breslaw Ash, LLC*,[40] in support of its position. At issue in *Kaplan* was a motion for relief from the automatic stay. The court found that the entire case had been filed in bad faith and found cause to lift the stay under § 362(d)(1). With respect to its position on reasonably equivalent value, the *Kaplan* court relied heavily upon Judge Barliant's decision in *Anand*, which, as noted above, was not endorsed by the district court on appeal.[41] Bank's reliance on *Johnson v. First Nat'l Bank*[42] is equally misplaced. In *Johnson*, the bank loaned new money in the amount of $33,000 to a corporation wholly owned by the debtors. As *part of the original transaction*, the bank obtained a mortgage on the debtors' residence. When the debtors tried to avoid the mortgage as a fraudulent transfer, the court found that the contemporaneous extension of funds to the corporation constituted reasonably equivalent value for the mortgage.[43] Similarly, in *Daly v. Fusco (In re All–Type Printing, Inc.)*,[44] the court found reasonably equivalent value where the debtor paid debt and, in exchange, received a dollar-for-dollar reduction in the amount of debt owed. It is easy to understand why the loan of new monies or the satisfaction of debt constitutes reasonably equivalent value. In each scenario, the debtor receives significant value in the form of new cash or debt reduction and the debtor's net worth remains unaltered. In the present case, Debtors received no new funds, nor did they receive any reduction in their overall liability to the Bank.

Prior to March 31, 2000, Debtors and the Trust were jointly and severally liable

---

37. *Anand I, supra,* 210 B.R. 456.

38. *Id.* at 459.

39. *Anand II, supra,* 239 B.R. at 518 (citation omitted).

40. 264 B.R. 309 (Bankr.S.D.N.Y.2001).

41. *See id.* at 329, n. 69.

42. 81 B.R. 87 (Bankr.N.D.Fla.1987).

43. *Id.* at 88.

44. 274 B.R. 316 (Bankr.D.Conn.2002).

to the Bank on the Sabre debt in an amount in excess of $8.8 million. The Commercial Property, although subject to mortgage liens held by Gold, had significant equity. After the March 31, 2000, transaction, Debtors, the Trust and Sabre were still saddled with the same debt to the Bank, but one of the three tracts of the Commercial Property was now pledged to the Bank. The effect of the pledge was to improve the collateral position of the Bank at the expense of the Debtors' unsecured creditors. The most that Sabre, Debtors and the Trust received from the Bank was an agreement to forbear for thirty days, as the March 31, 2000, note was due and payable in full on April 30, 2000. The effect of the September 2000 transaction was to encumber all of the Commercial Property with all of the Sabre debt to the Bank. In return for this encumbrance, Debtors were left with the same obligations which they faced prior to the transaction. The parties have stipulated that the restructures "neither increased or reduced" the obligation of the Debtors to the Bank.[45]

Bank's contention that the purpose of this transaction was to provide forbearance to Sabre and the Debtors is suspect. The loan officer responsible for the Sabre loans testified that Sabre was in default of its obligations to the Bank immediately after the September 2000 transaction. Under the terms of the September 2000 mortgage, Bank was authorized to foreclose if Sabre defaulted on any of its obligations to the Bank.[46] The one-sidedness of this transaction is not surprising when one considers the fact that, at the time of these restructures, the Bank held virtual control over Sabre. Part of the Bank's collateral package was a pledge of the corporate stock of Sabre. Under this pledge, the Bank held the power to vote the corporate stock of Sabre. The Bank later used that power to remove all of the officers, directors and management of Sabre (including the Debtors), replace them with people of their own choosing, and exercise complete control of the company. Even if the Bank did provide some small measure of forbearance in exchange for the mortgages, the Court fails to see, on the record before it, how such forbearance constitutes "reasonably equivalent value." [47]

Bank also argues that

the Second Solomon Mortgage materially induced [Bank] to forego its rights to foreclose on the Property and instead to restructure the debt owed by Sabre and the Debtors. The forbearance allowed the Debtors and Sabre time to seek out additional sources of financing. Had

---

45. *Pre–Trial Order,* § 2, ¶ 17.

46. Under the terms of the September 2000 mortgage, the "Secured Indebtedness" was defined to include all obligations of Debtors to the Bank, including their obligations under their guaranties of the Sabre indebtedness. *See Pl.'s Ex. 7,* ¶ 1. Said mortgage went on to provide that the Bank was authorized to commence a foreclosure action upon the occurrence of any event of default, which included a failure to make any payments when due of any of the "Secured Indebtedness." *See id.* at ¶ 7. The September 2000 mortgage also contained a provision allowing the Bank to declare all of the Secured Indebtedness immediately due and payable if Debtors, Sabre and/or the Trust were in default of *any* of their monetary obligations to the Bank. *See id.* at ¶ 7.2. The testimony of Carol Kinzer, the loan officer of the Bank responsible for the Sabre loans, was in direct contradiction to the terms of the Second Mortgage. Ms. Kinzer testified that the purpose of the separate notes was to insure that only those notes were secured by the Commercial Property.

47. *See Wessinger v. Spivey, et al. (In re Galbreath),* 286 B.R. 185, 211 (Bankr.S.D.Ga. 2002) (finding that "the opportunity to keep a hemorrhaging business on life support was simply not reasonably equivalent to $1.5 million").

Stillwater foreclosed, Sabre would have ceased operations immediately. Thus, the forbearance allowed Sabre to remain in operation longer than it would have otherwise, yielding the Debtors additional payments of rent and salary. These additional payments resulting from the delayed foreclosure and the delay itself are all additional forms of value the Debtors received in exchange for the Second Solomon Mortgage.[48]

The problem with the Bank's position is that none of these alleged "benefits" have been quantified. With respect to the receipt of additional rents from the Commercial Property, there is no evidence in the record as to the amounts of money which may have been received. Moreover, the evidence before the Court was that none of those funds went into the hands of the Debtors; instead, those monies went to service the debt on the Commercial Property, including the amounts owed to the Bank under the September 2000 note. With respect to the issue of salary, the only evidence in the record is the testimony of Mr. Solomon that, upon his termination by Sabre (after management of Sabre had been changed at the direction of the Bank), he found new employment at an equal or greater rate of compensation. Given the direction of the United States Court of Appeals for the Tenth Circuit that courts should not indulge "in speculation" as to the nature and extent of value given,[49] the Court declines to do so and rejects this argument of the Bank.

Resolution of the question before the Court is dependent upon the perspective chosen to view the transaction. From the perspective of the Bank, it faced a significant loss on the Sabre loans. The taking of the mortgages was nothing more than an attempt by the Bank to minimize these losses, shore up its collateral position, making sure that it, and no other creditor of the Debtors, was in position to realize upon the remaining equity in the Commercial Property. From the Bank's standpoint, its actions were reasonable and prudent. Certainly, the Bank argues, it should not be punished for its conduct through the invalidation of its mortgages. From the perspective of the Trustee, the granting of the mortgages to the Bank transformed a portion of the Bank's debt from unsecured to secured, and encumbered any and all remaining equity in the Commercial Property to the detriment of the remaining unsecured creditors of the Debtors. The Court declines to adopt the tests outlined in *Anand* and *Kaplan*, and instead looks to all of the facts and circumstances of the particular case, with an eye towards the effect of the transaction upon the other unsecured creditors of the Debtors. From such a perspective, the Court concludes that the Debtors did not receive "reasonably equivalent value" in exchange for the mortgages which they granted the Bank on the Commercial Property. Having determined that the Debtors were insolvent at the time of the transfer, the Court rules that both of the mortgages may be avoided under §§ 544 and 548(a)(1).

### Conclusion

The mortgages obtained by the Bank from Debtors and the Trust on March 31, 2000, and September 29, 2000, may be avoided by the Trustee under §§ 544 and 548 of the Bankruptcy Code. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

### JUDGMENT

THIS MATTER came before the Court for trial on October 24, 2002. The issues

---

48. *Pl[.]'s Trial Brief* at 10.

49. *See Wes Dor, Inc., supra*, 996 F.2d at 243.

having been duly considered, and a decision having been duly rendered, for the reasons set forth in the Memorandum Opinion filed concurrently herewith,

IT IS HEREBY ORDERED that Scott Kirtley, Defendant herein, has the authority to avoid the mortgage given by the James M. Solomon and Carla D. Solomon Revocable Living Trust, as Mortgagor, to Stillwater National Bank and Trust Company, as Mortgagee, dated March 31, 2000, and filed of record April 27, 2000, in Book 6356 at Pages 2549–2555 of the real estate records of Tulsa County, Oklahoma, encumbering the real property legally described in Exhibit "A" attached hereto and incorporated herein by this reference.

IT IS FURTHER ORDERED that Scott Kirtley, Defendant herein, has the authority to avoid the mortgage given by the Debtors, James Milton Solomon and Carla D. Solomon and the James M. Solomon and Carla D. Solomon Revocable Living Trust, as Mortgagors, to Stillwater National Bank and Trust Company, as Mortgagee, dated September 29, 2000, and filed of record October 18, 2000, in Book 6430 at Pages 1578–1601 of the real estate records of Tulsa County, Oklahoma, encumbering the real property legally described in Exhibit "B" attached hereto and incorporated herein by this reference.

### EXHIBIT "A"

A part of Lot Eight (8), in Section Five (5), Township Nineteen (19) North, Range Fourteen (14) East of the Indian Base and Meridian, Tulsa County, State of Oklahoma, according to the U.S. Government Survey thereof, being more particularly described as follows, to-wit: BEGINNING at a point 40 feet south and 591.44 feet West of the Northeast Corner of Lot 8; THENCE West parallel with the North line of said Lot 8, a distance of 700 feet; THENCE South 468 ⅔ feet; THENCE East 700 feet; THENCE North 466⅔ feet to the POINT OF BEGINNING, LESS the East 560.7 feet thereof.

### EXHIBIT "B"

#### TRACT 1

A part of Lot Eight (8), in Section Five (5), Township Nineteen (19) North, Range Fourteen (14) East of the Indian Base and Meridian, Tulsa County, State of Oklahoma according to the U.S. Government Survey thereof, being more particularly described as follows, to wit:

BEGINNING at a point 40 feet South and 591.44 feet West of the Northeast Corner of Lot 8; THENCE West parallel with the North line of said Lot 8, a distance of 700 feet; THENCE South 466⅔ feet; THENCE East 700 feet; THENCE North 466⅔ feet to the POINT OF BEGINNING, LESS the East 560.07 feet thereof.

#### TRACT 2

A tract of land situated in Lot One (1), Block One (1), EASTGATE INDUSTRIAL PARK ADDITION, Tulsa County, State of Oklahoma, according to the Recorded Plat thereof, being more particularly described as follows, to wit:

BEGINNING at a point on the West line of Lot 1, Block 1, 256.20 feet South of the Northwest corner; thence South 0 20.25' East a distance of 205 feet; thence North 89 39.75' East a distance of 250 feet; thence North 0 20.25' West a distance of 205 feet; thence South 89 39.75' West a distance of 250.00 feet to the Point of Beginning.

AND

That part of the West Half of the Southeast Quarter of the Northeast Quarter (W/2 SE/4 NE/4) of Section 5, Township 19 North, Range 14 East of the Indian Base

and Meridian, according to the U.S. Survey thereof, described as follows, to wit:

BEGINNING at point on the Northwesterly Right–of–Way line of U.S. Hwy. # 66 By–Pass (Skelly Drive), said point being 20 feet East of the West line of said W/2 SE/4 NE/4, thence North parallel to and 20 feet East of said West line a distance of 860 feet; thence East at a right angle, for 250 feet; thence South and parallel to the West line of said W/2 SE/4 NE/4, along a straight line to a point of intersection with the Northwesterly Right–of–Way line of said Hwy. # 66 By–Pass; thence Southwesterly along said Right–of–Way line to the Point of Beginning.

### TRACT 3

That Part of Eastgate Industrial Park Addition to the City of Tulsa, Tulsa County, State of Oklahoma, according to the Recorded Plat thereof, being more particularly described as follows, to wit:

Commencing at the Southeast Corner of Lot 6, Block 2, Eastgate Industrial Park Third Addition, to the City of Tulsa, Tulsa County, State of Oklahoma, according to the Recorded Plat thereof; thence South 0 22′25″ East on an extension of the East line of said Lot 6, Block 2, a distance of 6.67 feet to a point on the North line of said Lot 1, Block 2, Eastgate Industrial Park Addition; thence due East along the North line of said Lot 1, Block 2 a distance of 602.48 feet to the point of beginning; thence continuing due East a distance of 219.94 feet; thence S 0 20′25″ East a distance of 195.19 feet; thence due West a distance of 220.07 feet; thence N 0 18′30″ West a distance of 195.18 feet to the point of beginning.