**In re McCOOK METALS, L.L.C., and McCook Equipment, L.L.C., Debtors.**

**Joseph Baldi, as Chapter 11 Trustee of McCook Metals, L.L.C., Plaintiff,**

**v.**

**Michael Lynch, John Kolleng, Matthew Ochalski, James McCall, McCall Enterprises, LLC, and Longview Aluminum, LLC, Defendants.**

**Bankruptcy Nos. 01 B 27326, 01 B 27329.
Adversary Nos. 02 A 00790, 03 A 02140.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 14, 2005.

Robert M. Fishman, Jeffrey Widman, George J. Spathis, Shaw, Gussis, Fishman, Glantz, Wolfson & Towbin LLC, Chicago, IL, for trustee.

Michael Duffy, Roy R. Brandys, Childress & Zdeb, Ltd., Chicago, IL, for Michael Lynch.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Chief Judge.

These two adversary proceedings, arising in the bankruptcy of McCook Metals, L.L.C., are before the Court for judgment after a joint trial. The proceedings were brought by Joseph Baldi, the bankruptcy trustee, against a number of parties, including Michael Lynch. The trustee settled his claims against the other defendants, so that only Lynch was involved in the trial. Both of the adversaries allege an improper transfer of the debtor's right to purchase an aluminum smelter, but they seek different relief. The first adversary, No. 02 A 790 (the "2002 Adversary"), seeks monetary damages under several theories:

· Counts I through III make fraudulent transfer claims. Counts I and II seek avoidance of transfers under § 548 of the Bankruptcy Code (Title 11 U.S.C.) and § 5 of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5. Count III seeks an award of the value of the property involved in the transfers, pursuant to § 550(a) of the Code.

· Count IV sets out a claim for common law conversion.

· Count V sets out a claim for common law breach of fiduciary duty.

The second adversary proceeding, No. 03 A 2140 (the "2003 Adversary"), addresses claims made by Lynch against the debtor's estate, seeking disallowance (Count I) or equitable subordination (Count II) pursuant to §§ 502(d) and 510(c) of the Bankruptcy Code.

As discussed below, with respect to the 2002 Adversary, the trustee is entitled to judgment against Lynch in the amount of $2,744,000 on Counts I through III, and, alternatively, to judgment in the amount of $1,637,993 on Count V; Lynch is entitled to judgment on Count IV. With respect to the 2003 Adversary, Lynch's claims are disallowed pending his payment of the judgment on Counts I through III of the 2002 Adversary; however, any subsequently allowed claim by Lynch against the estate will not be equitably subordinated.

### Jurisdiction

Under 28 U.S.C. § 1334(a), the district courts have exclusive jurisdiction over bankruptcy cases. Pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has referred its bankruptcy cases to the bankruptcy court of this district. When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core proceedings within the case. The pending adversaries are core proceedings under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate); (C) (counterclaims by the estate against persons filing claims against the estate); and (H) (proceedings to deter-

mine, avoid, or recover fraudulent conveyances). This court may therefore enter final judgments in these adversaries.

## Findings of Fact

### A. Michael Lynch and McCook Metals, L.L.C.

Michael Lynch is an entrepreneur whose career began in real estate and developed into the ownership and management of troubled business. (Tr. Vol. III at 8–20.)[1] His experience, as well as his demeanor as a witness, establishes him as a knowledgeable, articulate, and persuasive investor and manager.

In the course of his career, Lynch founded Michigan Avenue Partners, LLC ("MAP"). (Tr. Vol. III at 10–12.) Originally, MAP was in the business of acquiring financially distressed real estate (Tr. Vol. III at 15), but it eventually began acquiring distressed businesses. (Tr. Vol. III at 19–20, 35–36.) In October of 1997, Lynch was approached by Reynolds Metals Company ("Reynolds") regarding the possibility of MAP acquiring an aluminum processing plant owned by Reynolds in McCook, Illinois. (Tr. Vol. III at 16–17.) The McCook plant had been supplying aluminum sheet to the automobile industry and was losing money. (Tr. Vol. III at 21; D. Ex. 54.) Lynch believed that the McCook plant could return to profitability by focusing on development of high-tech aluminum lithium alloys for the aerospace industry. (Tr. Vol. III at 22; D. Ex. 54.) Accordingly, in 1998, he arranged for the acquisition of the McCook plant. (Tr. Vol. III at 36; D. Ex. 54.)

However, the acquiring entity was not MAP, but a new Illinois limited liability company, McCook Metals, L.L.C. ("McCook"). (Trustee Findings at 3, ¶ 9; Lynch Response at 3.) Lynch was a 50% member owner of McCook and, at all times relevant to this case, was its chairman and chief executive officer. (Joint Pre–Trial Statement at 11, ¶ C.1.e; Trustee Findings at 2, 3, ¶¶ 3, 13; Lynch Response at 2, 4.) In these capacities, Lynch was authorized to preside over all meetings of the members and board of managers and, subject to the direction of that board, to manage the business of the company. (D. Ex. 37, at 19, § 5.7(d), (g).) He had the most weight in the decision-making process at McCook and was generally "in charge." (Babirak Dep. at 103–04.)

In connection with the McCook acquisition, Reynolds agreed to supply McCook with all of the high purity aluminum it required during the period 1998 through 2003, at a fixed premium over the price for commodity aluminum (the "Supply Agreement"). (P.Ex. 41; Tr. Vol. I at 62–63; Tr. Vol. III at 37, 40.) Reynolds provided this high purity aluminum from its Longview, Washington smelter, and McCook in fact purchased substantially all of its high purity aluminum from this smelter. (Trustee Findings at 4, ¶¶ 16–18; Lynch Response at 5.)

---

1. The trial in this matter was conducted on three days, August 16–18, 2004. The trial transcript ("Tr.") is in four volumes. Volume I contains the proceedings of August 16; Volume II, the proceedings of the morning of August 17; Volume III, the proceedings of the afternoon of August 17; and Volume IV, the proceedings of August 18. Other citations are to numbered exhibits filed by the trustee ("P.Ex."), by Lynch ("D.Ex.") and by the parties jointly ("Joint Ex."); to the Joint Pre–Trial Statement filed on February 2, 2003 in the 2003 Adversary ("Joint Pre–Trial Statement"); to Plaintiff's Proposed Findings of Fact and Conclusions of Law filed on October 8, 2004 ("Trustee Findings"); to Defendant Michael Lynch's Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law filed on October 25, 2004 ("Lynch Response"); and to transcripts of the depositions of Michael Lynch, taken on May 4, 2004 ("Lynch Dep."), John Babirak, taken on April 16, 2004 ("Babirak Dep."), and Frederic Lieber, taken on August 6, 2004 ("Lieber Dep.").

General Electric Capital Corporation ("GECC") provided financing for the McCook acquisition. (Trustee Findings at 3, ¶ 10–11; Lynch Response at 3–4.)

Initially, McCook's business was successful; the financial results in the first year of its operations (1998–99) substantially exceeded the projections of the business plan presented to GECC. (Tr., Vol. III at 25.) However, beginning in the second half of 1999 and continuing thereafter, McCook's financial performance suffered from reduced prices for its products and higher costs for raw materials. (Babirak Dep. at 83.) Lynch attributed much of this decline in financial performance to competition from Alcoa, Inc. ("Alcoa"), a vertically integrated entity that controlled its own raw materials and was McCook's largest competitor in the production of aluminum plate for aerospace operations. (Tr. Vol. I at 62–63; Tr. Vol. III at 41–45; D. Ex. 54.)

Whatever the cause, McCook's financial condition had deteriorated sufficiently that as early as the year 2000, GECC became concerned about the situation and eventually transferred the McCook account to a watch list for financially troubled companies. (Tr. Vol. IV at 64, 66–67.) By December 31, 2000, McCook was insolvent, unable to pay its debts as they became due, and was engaging in business with unreasonably small amounts of capital, as determined at a prior, bifurcated trial in the 2002 Adversary. (See Order of January 16, 2004.) On August 6, 2001, McCook filed a voluntary bankruptcy petition, giving rise to the present case.

## B. The antitrust action against Alcoa

In the summer of 1999, the officers at McCook became aware that Alcoa and Reynolds intended to merge. (Tr. Vol. I at 62; Tr. Vol. III at 51–52; D. Ex. 53.)

This potential merger was alarming to Lynch and the other McCook member owners, because it would put Reynolds' Longview smelter-the source of McCook's high purity aluminum-under the control of McCook's principal competitor. (Trustee Findings at 6, ¶ 29; Lynch Response at 7.) Accordingly, McCook opposed the merger in proceedings before the U.S. Department of Justice and the European Union Competition Committee (the "EU"). (Tr. Vol. I at 63–63; Tr. Vol. III at 54–62; D. Ex. 54.) Only the EU provided any relief to McCook, and the relief was limited to imposing a condition on the proposed merger-that after merging with Reynolds, Alcoa would be required to divest at least 25 percent of its ownership interest in the Longview smelter. (D. Ex. 52; Tr. Vol. I at. 67; Tr. Vol. II at 62.) Viewing this as an inadequate remedy, McCook filed an antitrust action against Alcoa in the District Court for the District of Columbia on May 8, 2000. (D. Ex. 55; Tr. Vol. I at 67–69; Tr. Vol. III at 63.)

GECC was aware of McCook's efforts to oppose the Reynolds–Alcoa merger and voiced no objection to McCook committing its resources in those efforts. (Trustee Findings at 7, ¶ 34; Lynch Response at 8.)

## C. McCook's agreement to purchase the Longview smelter

In June 2000, two months after McCook filed its antitrust action, it received a confidential memorandum from Alcoa offering to sell all or a portion of its interest in the Longview smelter. (Tr. Vol. I at 71; P.Ex. 36.) McCook conducted due diligence and submitted an initial offer to Alcoa, "priced in a manner that [would] result in the settlement of litigation." (P.Ex. 20; D. Ex. 58, 62; Tr. Vol. I at 76–77; Tr. Vol. IV at 27–29.)

Negotiation of the purchase price for the Longview smelter occurred in July and

August of 2000 through a series of communications between Lynch and John Kolleng of McCook and Irene Schmidt of Alcoa. (P.Ex. 20; D. Ex. 62.)[2] McCook initially offered Alcoa $135 million in cash, plus outstanding accounts receivable and finished inventory. (Tr. Vol. I at 74; D. Ex. 62; P.Ex. 20–letter of July 27, 2000.) McCook's offer was intended to produce a final negotiated purchase price of $150 million, which would be twice Longview's annual EBITDA. Lynch and Kolleng viewed this as a good price even for a distressed business, since the EBITDA multiples of publicly traded companies in the aluminum industry were five to seven times EBITDA. (Tr. Vol. III at 71–72; Tr. Vol. IV at 27–29.)

Alcoa counter-offered at $187 million, which Alcoa asserted would allow McCook to earn a 10% rate of return on invested capital. (D. Ex. 62; P.Ex. 20–letter of July 29.) Alcoa's counteroffer provided that if the parties reached agreement on price, Alcoa would negotiate the terms of a final purchase agreement solely with McCook (or, in the words of the letter, would consider McCook's bid as "pre-emptive"). (*Id.*)

McCook's next offer raised its bid to $145 million and made specific reference to its pending antitrust claims, stating that it "believe[d] there is significant value to these claims," but that it would be "willing to forego pursuing them" if Alcoa accepted its bid. (D. Ex. 62; P.Ex. 20–letter of August 3.)

Ultimately, on August 8, 2000, McCook and Alcoa agreed in principle to a $155 million purchase price for Alcoa's entire interest in the Longview smelter. (Tr. Vol. I at 86–87; Tr. Vol. III at 72–73; D.

Ex. 62; P.Ex. 20–letter of August 8.) In the context of the parties' dealings, this gave McCook a "pre-emptive" right to negotiate the terms of a final purchase agreement for the Longview facility, based on the $155 million purchase price. McCook's August 8 letter announcing the agreement reflects that the parties were already working on a draft of a final purchase agreement. (*Id.*)

### D. The impact of energy prices

Electricity is one of the major cost components for an aluminum smelter. (Babirak Dep. at 32–33.) The Longview smelter required 200,000 megawatts to operate at full capacity–140,000 megawatts for a newer, north plant, and the balance for an older south plant. (Tr. Vol. I at 87–88.) At the time of the McCook/Alcoa negotiations, the Longview smelter obtained its electricity under a supply contract with the Bonneville Power Authority ("BPA") at a fixed rate of 22.6 mils (or 2.26 cents) per kilowatt hour, but since this contract extended only to the end of September 2001, Alcoa negotiated a new contract with BPA, extending through 2006. (D. Ex. 57 at 11.) The new Alcoa/BPA contract called for a limit of 140,000 megawatts, a base price of 25.5 mils, and the possibility of rate increases (referred to as "CRAC adjustments") based on market conditions. (*Id.*)

During the summer of 2000, at the time McCook was negotiating with Alcoa for the purchase of the Longview smelter, the western United States was experiencing dramatic increases in energy prices, a situation attributed to market manipulation by Enron. (Tr. Vol. I at 120–122; Tr. Vol. III at 83; D. Ex. 92.) Whatever the cause of the price volatility, energy costs were a

---

**2.** Kolleng was a member owner of McCook, its vice chairman, and its general counsel, with responsibility for strategic planning, acquisitions and financing. (Tr. Vol. I at 61–

62.) His demeanor as a witness was that of a careful, knowledgeable, and competent professional.

major part of the negotiation between McCook and Alcoa. Alcoa based its July 29 proposal on a detailed analysis of available prices for electricity (assuming that during the 2002–2006 period, the Longview smelter would be able to obtain two-thirds of its power requirements at 26.5 mils and the balance at 34 or 36 mils). McCook's August 3 response offered to pay significantly more for the acquisition if Alcoa would guarantee a supply of electricity at 23.5 mils, but its $145 million offer was expressly based on "the existing BPA offer for energy" that Alcoa had negotiated. (D. Ex. 62; P.Ex. 20; Tr. Vol. I at 78–79.)

Continuing uncertainty about energy prices prevented McCook from obtaining conventional financing for the Longview smelter acquisition, even though it approached several potential lenders. (Babirak Dep. at 34–35.) McCook and Alcoa did not execute a binding purchase agreement until December 19–more than four months after the August letter agreement-and only after BPA offered a "curtailment agreement" to the owner of the Longview smelter. BPA's offer was to pay the owner not to use the electricity available under the existing contract, which would allow BPA to sell the electricity at higher prices to other users. (*Id.* at 35–36; D. Ex. 95.) BPA ultimately offered $226 million to curtail production at the Longview smelter for fourteen months. (Tr. Vol. I at 83–84, 88.) This amount was more than enough to finance the smelter acquisition. (P.Ex. 56; Tr. Vol. IV at 97.)

### E. The acquisition of the Longview smelter by Longview Aluminum, LLC

Consistent with the August letter agreement, the initial drafts of a final agreement for the acquisition of the Longview smelter reflected that McCook would be the acquiring entity. However, by mid-October,

McCook's counsel was instructed to insert a new entity-Longview Aluminum, LLC ("Longview LLC")—as the purchaser. (P.Ex. 83; Tr. Vol. I at 163–64.) Longview LLC—a Delaware limited liability company-was actually formed a month later, on November 16, 2000. (D. Ex. 5, 91; Joint Pre–Trial Statement at 11–12, ¶ C.1.d, q.) As with McCook, Lynch controlled Longview LLC. He was a 56% member owner, the managing member, and chairman. (Joint Ex. 1, Tab 1 at 49; P.Ex. 106, Statement of Financial Affairs at 11, Item 21b.)

The parties recognized, however, that the right to enter into a purchase contract under the August letter agreement belonged to McCook. The first version of the purchase contract that purported to be binding on the parties, dated December 19, 2000, states that Longview LLC will be the purchaser, but it is both addressed to and signed by Lynch as Chairman of McCook. (D.Ex.95.)

Although Lynch gave testimony to the contrary (Tr. Vol. III at 123–24), it is likely that neither he nor any other McCook personnel discussed with GECC the possibility of McCook acquiring the Longview smelter, either directly or through a subsidiary, and that GECC never refused to permit such an acquisition. (Tr. Vol. IV at 53–59.) The ordinary practice of Lynch's investment group was to create separately owned entities as acquisition vehicles, so as to avoid cross-liability among the investments. (Tr. Vol. III at 13, 31–36.) Particularly since McCook was in financial distress in late 2000, it is likely that Lynch chose a separate entity at least in part to insulate the Longview assets from claims of McCook's creditors.

Ultimately, Lynch executed formal purchase documents, dated December 22, 2000 and February 26, 2001 (when the transaction closed), on behalf of Longview LLC as

purchaser. (Joint Ex.1, Tabs 1 and 2.) The final purchase price was $140 million, as a result of various adjustments obtained through aggressive bargaining by Lynch and the obligation imposed by the EU on Alcoa to complete its divestiture of the Longview smelter. (Trustee Findings at 10, ¶ 56; Lynch Response at 56.)

As part of the acquisition, a number of separate agreements were entered into:

· In addition to the asset purchase agreement and the curtailment agreement, Alcoa assigned to Longview LLC the new energy contract that it had negotiated with BPA (Joint Ex. 1; D. Ex. 59), and Longview LLC executed a new agreement with BPA for the 2002–06 period (the "Longview/BPA Power Agreement"), consistent with the terms Alcoa had negotiated.

· To avoid Longview LLC's becoming responsible for any existing environmental liabilities, Longview LLC entered into a 99–year lease of the real estate connected with the smelter rather than taking title to this property. (Joint Ex. 3, Tab 42.)

· In assuming the business operations of the smelter, Longview LLC assumed Reynolds' obligations under the Supply Agreement with McCook. (Joint Ex. 1, Tab 1 at 2.1(b)(iii); P.Ex. 41.) However, because Longview LLC would be curtailing its production for fourteen months, it could not fulfill this obligation to supply aluminum to McCook. Accordingly, Lynch, in his capacity as chairman of both Longview LLC and McCook, terminated the Supply Agreement, releasing Longview LLC from any liability to McCook. (P.Ex. 41; Tr. Vol. I at 89–90.) [3]

· In exchange for Alcoa's complete divestiture of the Longview smelter to Longview LLC, Lynch signed a settlement agreement on behalf of McCook, releasing all claims against Alcoa. (D. Ex. 26; Tr. Vol. III at 94.)

### F. Intent to restart the Longview smelter

Lynch's investment group fully intended to restart production when the curtailment period ended in April 2002. (Tr. Vol. I at 87–88, 120, 158, 218–20; Tr. Vol. IV at 87–89.) In addition to financing the purchase price for the Longview smelter, the curtailment payments from BPA were expected both to cover the cost of maintaining the Longview smelter and to generate a surplus of $5.876 million at the end of the curtailment period, which would be used for the restart. (Tr. Vol. I at 152–53; Tr. Vol. III at 87–89; Babirak Dep. at. 57–60.) The anticipated cost of restarting the north plant after curtailment was between $4 and $5 million. (Tr. Vol. I at 124–125.)

Although production was curtailed, Longview LLC kept the north plant open and retained a crew to perform ordinary plant maintenance during the curtailment period. (Tr. Vol. I at 102.) The Longview/BPA Power Agreement assured the availability of power (albeit at prices subject to market adjustments) sufficient to operate the north plant from the end of the curtailment period until 2006. (Tr. Vol. I at 86–88.)

### G. Lynch and McCook after the Longview acquisition

As noted above, McCook filed the pending bankruptcy case on August 6, 2001, less than six months after the close of the Longview acquisition. The filing sought

---

**3.** After the Longview acquisition, McCook was required to spend $830,205 more than it would have spent under the Supply Agreement to purchase high purity aluminum on the spot market. (P.Ex. 34; Tr. Vol. I at 93; Babirak Dep. at 91–95.)

relief under Chapter 11 of the Bankruptcy Code. (Docket No. 1.) By the end of that month, Lynch was no longer employed by McCook and began taking a salary and benefits from Longview LLC. (Tr. Vol. I at 141; P.Ex. 122.)

On November 2, 2001, the United States Trustee appointed Joseph Baldi as the Chapter 11 Trustee of McCook. (Docket No. 948.) On February 5, 2002, Lynch filed proofs of (1) an unliquidated interest as 50% owner of McCook, (2) an undetermined wage claim, (3) a claim for contributions to an employee benefit plan, (4) a claim for unreimbursed business expenses, and (5) a claim for indemnification and reimbursement against McCook. (2003 Adversary, Docket No. 1.) On February 13, 2003, the Court converted the captioned cases to ones under Chapter 7 of the Bankruptcy Code, and Baldi was reappointed as the Chapter 7 trustee. (Docket Nos. 947–48.)

### H. Longview LLC after the acquisition

As expected, Longview LLC operated profitably during the curtailment period, recording a pretax profit for 2001 of more than $2.9 million. (Trustee Findings at 19, ¶ 107; Lynch Response at 27.) However, as a result of a combination of (1) continued high energy prices, (2) its inability to negotiate a new collective bargaining agreement, and (3) the imposition of a lien on its assets by the Pension Benefit Guarantee Corporation (arising from control group liability with McCook and another commonly owned company), Longview LLC never reopened its smelter at the end of the curtailment period. (Tr. Vol. III at 100–07.) Longview LLC itself filed a voluntary bankruptcy petition in March 2003.

### I. The value of the Longview assets

One of the major factual disputes at trial was the value of the assets that Longview LLC acquired from Alcoa, as of February 26, 2001, the date of the acquisition. Each party presented an expert witness on this issue. Scott Peltz testified on behalf of the trustee, Frederic Lieber on behalf of Michael Lynch.[4] Each expert testified that the proper method for valuing the assets was to measure their ability, as of the acquisition date, to generate future cash flows. (P.Ex. 5 at 5; Lieber Dep. at 17.) Peltz opined that as of that date, the value of the assets acquired by Longview LLC was $11.1 million. (P.Ex. 5; Tr. Vol. I at 192–93.) Lieber testified that they had no value. (D. Ex. 4 at 6.) Peltz's opinion is substantially more persuasive.

1. *Peltz's opinion of value.* Peltz's calculation of a $11.1 million present value measured three distinct periods of operational cash flow from the Longview assets: (1) operations during the BPA curtailment agreement (from the date of the closing to the end of April 2002), for which Peltz attributed a present value of $5.3 million; (2) operations during the period covered by the Longview/BPA Power Agreement (from April 2002 through September 2006), for which he attributed a present value of $5.8 million; and (3) operations after the end of the Power Agreement (post-September 2006), for which he attributed no value. (P.Ex. 5; Tr. Vol. I at 207–32.) Each of these estimates is reasonable-indeed, they may be overly conservative.

a. *The curtailment period.* Peltz valued the income from the Longview assets during the curtailment period (1) by using a management projection prepared at the

---

4. Pursuant to an agreement of the parties, Lynch proffered Lieber's testimony by way of a pretrial deposition. (Tr. Vol. IV at 48–49.)

time of the acquisition, which showed that $5.874 million would remain from the BPA curtailment payments at the end of the period, and (2) by discounting that amount to present value as of the acquisition date, using a discount rate of 10%. (P.Ex. 13; Tr. Vol. I at 207–12.) No evidence was presented to show that the management projection Peltz used was other than what it appeared to be-the best estimate of prospective cash flows from knowledgeable financial analysts closely involved in the acquisition. And indeed, there is particular reason to trust the projections for the curtailment period, since both the income (from BPA payments) and the costs (for maintaining a non-operating smelter) were largely fixed. The projection may actually be conservative. Longview LLC's actual cash flow from operations during this period substantially exceeded the projected amount (Tr. Vol. I at 207–12; P.Ex. 5 at Tab C4) and Lynch repeatedly testified that management expected $10–11 million to remain in Longview LLC's treasury at the end of the curtailment period (Tr. Vol. III at 89–90 and Tr. Vol. IV at 16). Moreover, given the 8.5% prime rate in effect at the time of the acquisition (*see* Board of Governors of the Federal Reserve System, Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates (visited Jan. 12, 2005) <http://research.stlouisfed.org/fred2/data/PRIME.txt>) and the small risk of nonpayment from BPA, a 10% discount rate for cash flow from this period is appropriate. Thus, Peltz's valuation of $5.4 million for the

cash flow from the curtailment period cannot be seen as excessive.

Indeed, a considerably higher valuation might have been justifiable. A discounted cash flow analysis ordinarily does not take into consideration an investor's cost of financing the acquisition. (*See, e.g.,* P.Ex. 5, Tab D2, Peltz's calculation of value for the period following curtailment, which adds interest expense to net income in calculating free cash flow.) But in calculating the value of cash flows for the curtailment period, Peltz deducted from the cash flow all of the interest expense expected to be paid by Longview LLC on its bridge loan-an amount exceeding $22 million.[5] Thus, Peltz's valuation for the cash flow from the curtailment period is quite conservative.

b. *The period of the Longview/BPA Power Agreement.* Peltz opined that the Longview assets had an additional $5.8 million in net present value from projected cash flows between April 2002 and September 2006, the period of operations covered by the Longview/BPA Power Agreement. (P.Ex. 5 at 6–7.) Again, Peltz relied on a management projection prepared at the time of the acquisition (P.Ex. 12) to determine the expected operating results from this post-curtailment operating period, choosing the most conservative cash flow projection from among those available. (P.Ex. 9–12; Tr. Vol. I at 215–18.) Peltz's valuation method involved a probability table with three scenarios: (1) that the plant would re-open and generate the projected positive cash flows between 2002 and 2006, which Peltz

---

**5.** The finance charges include $10.4 million in Lender Commitment Fees and Transaction Expenses (P.Ex. 13 at 9) and $12.1 million in periodic finance charges (the difference between the $155 million principal amount of the loan and $167.1 in total debt service). (*Id.* at 10.) Assessing these finance charges before measuring cash flow from the Longview acquisition is particularly questionable

in light of the fact that BPA would have been willing to make an upfront, lump sum payment of the $226 million curtailment payment, eliminating the need for more than one day of bridge financing. (Tr. Vol. III at 90–91, Lynch's testimony that delayed payment from BPA was arranged so as to limit the personal tax liability of Longview LLC's member owners.)

discounted to present value using a 14% discount rate reflecting average aluminum industry returns; (2) that the plant would re-open but merely operate at a break-even point for the period, resulting in no value; and (3) that the plant would not re-open, either because the smelter could not be restarted or because economic conditions would make restarting economically unfeasible, and that Longview LLC would incur liability under a "take or pay" provision in the Longview/BPA Power Agreement, resulting in a negative value. (P.Ex. 5, 27; Tr. Vol. I at 221, 228–29.)

Peltz determined that the probability of each of these three scenarios would depend primarily upon the price of aluminum between April 2002 and September 2006. (Tr. Vol. I at 221–22.) He noted that the historical break-even price of aluminum was 71 cents per pound and that, historically, aluminum prices exceeded 71 cents 53.1% of the time, equaled 71 cents 24.7% of the time, and were below 71 cents 22.2% of the time. Peltz applied these percentages to the values of his three scenarios and combined the results to reach an overall value of $5.8 million for the Longview smelter's cash flow during the period covered by the power agreement. (P.Ex. 5 at 6–7.)

As with his curtailment period analysis, Peltz's opinion as to cash flows during the period of the power agreement is reasonable if not overly conservative. The oper-ating results projected by management at the time of the acquisition again appear to reflect a competent analysis of the available information.[6] And as Peltz recognized at trial, his probability approach can be seen simply as a method for applying a higher discount rate to management's projected cash flows in light of the risk produced by uncertainty in energy prices. (Tr. Vol. I at 225–26.) In response to a question from the court, Peltz calculated an overall 30% discount rate applicable to operations in both the curtailment period and power agreement period. (P.Ex. 124; Tr. Vol. II at 13–15.) Had Peltz considered only projected cash flows during the power agreement period covered by his probability analysis, a discount rate of nearly 50% would have been required to obtain his $5.8 million present value. This rate is exceptionally high (nearly six times the current prime rate), as reflected in Peltz's testimony that an appropriate rate to account for the possibility of Longview LLC's liquidation would be 28%. (Tr. Vol. II at 14.)[7]

c. *The period following the Power Agreement.* Finally, for the period after September 2006, when the Longview/BPA Power Agreement would no longer be in effect, Peltz valued the cash flows at zero "[d]ue to the uncertainty surrounding the sourcing and pricing of electricity." (P.Ex. 5 at 7.) Once more, this approach, though not unreasonable, may be overly conserva-

---

6. For example, on the critical question of energy cost, the projected rate of 29.5 mils was substantially higher than the average base rate prior to 2001. (Tr. Vol. I at 218.) And a comprehensive review of energy rates and industry trends prepared by BPA at the time of the Longview acquisition projected that 1,400 megawatts of BPA electricity would indeed be available to Longview LLC at 29.5 mils. (P.Ex. 31 at 11; Tr. Vol. I 219–20.) Similarly, the projections account for the special startup costs that would be incurred after curtailment. Longview LLC projected free cash flows in 2002 at negative $22 million and projected negative gross margin for April and May of 2002, when the startup would be taking place. (P.Ex. 10; Tr. Vol. I at 217.)

7. The very high discount rate appears to have resulted from Peltz's use of negative cash flow in his liquidation scenario, even though, as he testified, "in a real world scenario it's arguably zero also because ... you would liquidate, pay what you could and the rest would potentially terminate." (Tr. Vol. I at 229.)

tive. The volatility of energy prices in February 2001 made it difficult to predict price levels for a period more than five years in the future, but as Peltz recognized in his written opinion, price volatility would also have produced at least some possibility for economically viable operation of the smelter during that period, and hence some positive value. (*Id.*)

2. *Lieber's opinion of value.* Frederic Lieber's opinion of the value of the Longview assets as of the acquisition was based on the assumption that "the energy market was such that profitable operations were not possible." (Lieber Dep. at 22.) Accordingly, while agreeing with Peltz that a discounted cash flow analysis was appropriate in valuing the assets, Lieber concluded that such an analysis could not be performed, and that the assets had no value. (*Id.* at 21.)

The difficulty with Lieber's approach is that it is not based on information contemporaneous with the acquisition. For example, Lieber's ultimate evidence for the proposition that energy costs would exceed levels needed to operate an aluminum smelter is a chart showing that a large number of smelters operating in the Pacific Northwest "at or around" the time of the acquisition were no longer in operation at the time of trial. (D. Ex. 4 at 6.) Such post-acquisition events, however, do not demonstrate the market conditions at the time of the acquisition. Similarly, earlier in his report, Lieber points to difficulties encountered by Enron during "subsequent months" as causing the collapse of a project intended at the time of the acquisition

to supply low-cost energy to the Longview smelter. (*Id.* at 6.) Most troubling, Lieber ignored the contemporaneous management projections calling for successful operation of the smelter based on conversations he had with Lynch at the time of preparing his report-conversations in which Lynch apparently suggested that management was using artificially low energy prices in its projections. (Lieber Dep. at 30–33.) Thus, Lieber "didn't actually look at the energy pricing contained in Longview LLC's projections but rather relied solely on Mr. Lynch." (*Id.* at 32.) In preparation for the trial of this matter, Lynch had an obvious motive to recall the facts in such a way as to minimize the value of the Longview assets. His conversations with Lieber provide no basis for disregarding the contemporaneous projections relied on by Peltz.[8]

## J. Value received by McCook from the Longview acquisition

In connection with the closing of the acquisition of the Longview smelter, management recognized that McCook had expended $7,826,959 in prosecuting the antitrust action against Alcoa and pursuing the acquisition. At the closing, Lynch executed a promissory note from Longview LLC to McCook in this amount. (P.Ex. 42.) Longview LLC made a $500,000 initial payment on the note at the time of the closing, paid from the proceeds of its bridge loan, reducing the amount due under the note to $7,326,959. (Tr. Vol. I at 37; Tr. Vol. III at 96–97; D. Ex. 131.) Thereafter, Longview LLC made addition-

---

**8.** More generally, Lieber's opinion that the Longview assets had no value is contradicted by the conduct of Lynch and Kolleng. Their entire rationale for acquiring the Longview smelter was that this acquisition would assure McCook of a reasonably priced supply of high purity aluminum. (Tr. Vol. III. at 145.) As part of the acquisition, Lynch and Kolleng released McCook's antitrust claims against Alcoa and terminated its rights to aluminum under the Supply Agreement with Reynolds. This conduct is only reasonable if Lynch and Kolleng understood that the Longview smelter would reopen after the curtailment period and provide McCook with its aluminum requirements.

al payments on the note and made payments to third parties on behalf of McCook, in a combined amount of approximately $5,915,000, reducing the amount due under the note to $1,412,000. (Tr. Vol. I at 28–32.)

### K. Benefits to Lynch resulting from the Longview acquisition

After the closing of the Longview acquisition, Longview LLC made substantial payments to or on behalf of Michael Lynch. These included a $100,000 investment banking fee, $696,642 in salary and other direct payments, and $691,351 in payments of legal fees and other obligations to third parties, for a total of $1,487,993. (Trustee Findings at 19, ¶ 108; Lynch Response at 27–28.)

### L. Settlements in the 2002 Adversary

The trustee filed the 2002 Adversary against Longview LLC, Lynch, and other member owners of Longview LLC on May 29, 2002. Thereafter the trustee entered into settlements with all of the defendants except Lynch. The settlement with the other individual defendants resulted in a payment of $225,000 to the McCook estate. (See Docket Nos. 1191 and 1197 in the McCook Metals bankruptcy and Docket No. 125 in the 2002 Adversary.)

### Conclusions of Law

As noted above, the trustee's two adversary proceedings present the following claims against Lynch:

(1) damages for fraudulent transfer of McCook's right to purchase the Longview assets (2002 Adversary, Counts I–III);

(2) damages for conversion of that right to purchase (2002 Adversary, Count IV);

(3) damages for breach of fiduciary duty in transferring the right to purchase (2002 Adversary, Count V);

(4) an objection to Lynch's claims in this bankruptcy case (2003 Adversary, Count I); and

(5) equitable subordination of any of Lynch's claims not disallowed (2003 Adversary, Count II).

For the nonbankruptcy law relevant to these claims, the parties have employed Illinois law in their arguments, and accordingly that law will be applied in resolving these claims. *See In re Stoecker*, 5 F.3d 1022, 1029 (7th Cir.1993) ("Where ... the parties do not make an issue of choice of law, [the court has] no obligation to make an independent determination of what rule would apply if they had made an issue of the matter.").

### 1. Fraudulent transfer

Section 548 of the Bankruptcy Code sets out the Code's formulation of the ancient principle that creditors may recover property that the debtor transferred in an improper manner-through either (a) "actual fraud"-that is, a deliberate intent to hinder or delay collection efforts, or (b) "constructive fraud"-that is, without receiving fair value in exchange when the debtor was in a condition of insolvency.[9] As applicable to the present case, the relevant language of § 548 provides:

> The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... within one year before the date of the filing of the petition, if the debtor ... (A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debt-

---

9. The law of fraudulent transfer traces back to the Statute of 13 Elizabeth, enacted in 1570. See Gerald K. Smith & Frank R. Kennedy, *Fraudulent Transfers & Obligations: Is-*sues of Current Interest, 43 S.C. L.Rev. 709, 713 (1992) (outlining the development of the law).

or was ... indebted; or (B)(i) received less than a reasonably equivalent value in exchange for such transfer ... and (ii)(I) was insolvent on the date that such transfer was made....

11 U.S.C. § 548(a). Essentially similar provisions-but with a longer limitations period-are contained in Section 5 of the Uniform Fraudulent Transfer Act (UFTA), codified in Illinois as 740 ILCS 160/5, and available to a trustee in bankruptcy pursuant to § 544(a) of the Code. *In re Carrozzella & Richardson*, 286 B.R. 480, 483 n. 3 (D.Conn.2002).

 If a transfer is fraudulent under § 548 or § 5 of the UFTA, a trustee may recover the value of the property transferred either from the transferee or from "the entity for whose benefit such transfer was made," pursuant to § 550(a)(1) of the Code.[10] The trustee has the burden of proof by a preponderance of the evidence on all the elements of a fraudulent transfer and of the grounds for recovery.[11]

The trustee claims that McCook's right to purchase the Longview smelter from Alcoa was fraudulently transferred to Longview LLC, and that Lynch was an entity for whose benefit the transfer was made.[12] Certain elements of this claim are undisputed. Lynch does not deny that a fraudulent transfer of contract rights may give rise to liability under § 548 or the UFTA. (*See* Trustee Findings at 35, ¶ 30;

**10.** Section 9(b)(1) of the UFTA provides essentially the same relief as that accorded by Section 550(a), but refers to the "person" for whose benefit a fraudulent transfer was made. 740 ILCS 160/9 (West 1990). Either term would be applicable to a natural person such as Lynch, since the Code defines "entity" as including "person." 11 U.S.C. § 101(15).

**11.** There is a dispute over whether the higher, clear and convincing evidence standard applies to proof of actual fraud under 548(a)(1). *See Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1338 (10th Cir.1998). The same dispute exists under the UFTA. *See In re Solomon*, 300 B.R. 57, 62–63 (Bankr.N.D.Okla. 2003) (holding that Oklahoma would apply the preponderance standard); *Word Investments, Inc. v. Bruinsma (In re TML, Inc.)*, 291 B.R. 400, 436 (collecting authorities, and holding that Michigan would apply the clear and convincing standard under its version of the UFTA's predecessor, the Uniform Fraudulent Conveyance Act)., The Illinois courts do not appear to have addressed the question.

In *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991), the Supreme Court held that the preponderance standard applies to all causes of action arising under the Bankruptcy Code "unless particularly important individual interests or rights are at stake." There is no apparent reason for treating the interests of a defendant in an actual fraud proceeding under § 548(a)(1) as more important than the interests at stake in

*Garner*-the dischargeability of a debt under § 523(a)(2). Accordingly, the preponderance standard should apply to proof of actual fraud under § 548(a)(1). *See Greenfeld v. Goldschein (In re Goldschein)*, 241 B.R. 370, 378 (Bankr.D.Md.1999). Since, as noted below, the trustee's claim under § 548 is timely, there is no need to consider whether a higher standard of proof would apply to an actual fraud claim under the Illinois UFTA: no relief would be available under that statute that is not available under § 548.

**12.** The trustee also asserts that the cancellation of the Reynolds Supply Agreement was a distinct fraudulent transfer. (See *supra* p. 579 and note 3,) However, McCook could not have received performance under that agreement if it had acquired the Longview smelter-the obligation to perform under the Supply Agreement was assumed in the acquisition of the smelter-necessarily so, since Alcoa could hardly sell the Longview smelter and continue to be bound by an agreement whose performance required the output of that smelter. Accordingly, cancellation of the Supply Agreement cannot provide a basis for recovery separate from transfer of the right to purchase the smelter. Because, as discussed herein, the trustee is entitled to a recovery based on avoidance of the transfer of the right to purchase the smelter, no further consideration will be given to cancellation of the Supply Agreement as a distinct fraudulent transfer.

Lynch Response at 45, dealing with the transfer of the McCook's rights under the Reynolds Supply Agreement.) And although Lynch complains about the trustee's assertion that the right to purchase the smelter from Alcoa was a "corporate opportunity" rather than a contract right, McCook in fact had a right under the August 8 letter agreement to complete the purchase of the smelter. Nor is there any question that McCook made the transfer of that right at the time the Longview acquisition closed in February 2001–well within one year of McCook's August 2001 bankruptcy filing-and thus that the trustee's claims are timely under both § 548 and the UFTA. Finally, it has already been determined that McCook was insolvent at the time of the transfer.

The issues that the parties do dispute are whether the transfer was made with actual intent to hinder or defraud creditors of McCook, whether Longview LLC gave reasonably equivalent value to McCook for the right to purchase the assets, and whether Lynch is a person for whose benefit the transfer was made. As to each of these matters, the trustee has met his burden.

▮▮▮ *a. Actual intent.* As noted above, one of the grounds on which a transfer can be fraudulent is that it was made with "actual intent to hinder, delay or defraud" creditors. Since there is rarely direct evidence of the intent underlying a transfer of property, courts have looked at circumstantial evidence, often referred to as "badges of fraud," in determining whether a particular transfer was intended to harm creditors. *Taylor v. Rupp (In re Taylor),* 133 F.3d 1336, 1339 (10th Cir. 1998). A non-exclusive list of such "badges" is set out in § 5(b) of the UFTA, and several of the items on this list apply to the transfer of McCook's right to purchase the Longview smelter: the transfer was to an insider (a corporation with common ownership); the value received by McCook from Longview LLC was substantially less than the value of the right transferred (as discussed below); and the debtor was insolvent at the time of the transfer.[13] Also, the trustee points to Lynch's testimony that a separate LLC was formed to receive the Longview assets in order to insulate them from the claims of creditors of Lynch's other LLCs. (Tr. Vol. III at 9.)

In response, Lynch points to other factors: (1) that he and the other MAP investors had a practice of setting up separate LLCs, commonly owned by the same individuals, for each of their investments, (2) that his testimony about the advantages of limited liability in the Longview acquisition simply reflected this general investment approach, (3) that the trustee has not established any effort on McCook's part to conceal the transfer (*see* UFTA § 6(b)(3), listing as a factor relevant to actual intent whether "the transfer ... was disclosed or concealed"), and (4) that GECC would have had to consent to McCook's acquiring the Longview assets, and that its consent was not forthcoming. These factors, however, do not overcome the inferences of fraudulent intent otherwise established.

First, Longview LLC was different from Lynch's other investments. Here, Lynch

---

13. Cases dealing with actual fraud under 548(a)(1) have employed similar factors. *See Carmel v. River Bank Am. (In re FBN Food Servs., Inc.),* 185 B.R. 265, 275 (N.D.Ill.1995), *aff'd* 82 F.3d 1387 (7th Cir.1996) (considering (1) the absence of consideration when the transferor and transferee know that outstanding creditors will not be paid; (2) a huge disparity in value between the property transferred and the consideration received; (3) the fact that the transferee was an officer of the corporate transferor; (4) insolvency of the debtor; and (5) existence of a special relationship between the debtor and the transferee).

and the other investors did not themselves contribute the capital needed to acquire the assets; all of the investment was made through funds of McCook. And earlier Lynch investments did not involve the transfer of a valuable asset from an insolvent entity. The unique circumstances of the Longview acquisition make it unlikely that Lynch was simply acting out of habit in placing the Longview assets in a separate entity that he controlled.

Second, the evidence is at best equivocal as to whether GECC–McCook's largest creditor-was informed in advance of Lynch's plan to release McCook's antitrust claims against Alcoa in exchange for the acquisition of the Longview assets, but then transfer the right to acquire those assets to a separately owned LLC. The GECC employee principally responsible for the account, Michael McKay, could not recall being asked for input about the transaction until after it closed. (Tr. Vol. IV at 55.)

Third, there is no reason to believe that GECC would have refused to allow McCook to acquire the Longview smelter if this could have been accomplished without impairing GECC's other McCook collateral. Since the Longview assets were acquired with financing based entirely on the income they would generate (from the BPA curtailment agreement), GECC could have increased its collateral base with negligible risk if McCook had acquired the assets through a limited liability entity. Again, McKay's credible testimony is that Lynch never sought GECC's consent for McCook to acquire the assets. (Tr. Vol. IV at 54–55.)

Finally, even if GECC had refused consent for a McCook acquisition, McCook could still have required Longview LLC to pay fair value for the right to acquire the Longview assets, but no effort was made to appraise the Longview assets so as to

make such a payment. Thus, as noted above, the situation was one in which McCook's managers, mindful of its financial difficulty, set up the new LLC as a method for insulating the Longview assets from the claims of McCook's creditors. This conclusion, supported by the badges of fraud noted above, establishes the intent to hinder creditors required for a finding of actual fraud under § 548(a)(1).

██ *b. Reasonably equivalent value.* On the issue of constructive fraud, since McCook's insolvency at the time of the transfer was previously established, the only question is whether McCook received reasonably equivalent value from Longview LLC in connection with the transfer of its right to complete the smelter purchase. As indicated in the findings above, it did not. Equivalent value must be measured as of the time of the transfer. *Krommenhoek v. Natural Resources Recovery, Inc. (In re Treasure Valley Opportunities, Inc.),* 166 B.R. 701, 704 (Bankr.D.Idaho 1994) (citing 4 Lawrence King, *Collier on Bankruptcy* ¶ 548.09[1] at 548–116 (15th ed.1993) for the rule that "[s]ubsequent appreciation or depreciation" does not affect reasonably equivalent value). At the time of the transfer, the right to purchase the Longview assets was worth a minimum of $11.1 million; in exchange for giving up its right to affect the purchase, McCook received only Longview LLC's note in the amount of $7,826,959.

Lynch argues that in addition to the note from Longview LLC, McCook received the value of securing a prospective source of its raw materials not under the control of Alcoa. But McCook received that value by obtaining the right to purchase the Longview smelter itself-transferring the purchase right to Longview LLC gave McCook no greater access to raw materials than it would have had through its own ownership of the smelter.

In transferring its purchase right to Longview LLC, McCook did not receive equivalent value. Thus, in addition to actual fraud, the trustee has established that the transfer was constructively fraudulent.

*c. The person for whose benefit the transfer was made.* Lynch did not directly receive any part of the McCook contract rights transferred to Longview LLC. The trustee seeks recovery against him as a person "for whose benefit the transfer was made" (a status that can be referred to as "transfer beneficiary" for the sake of brevity). There is little case law analyzing the status of transfer beneficiary, and, as the Seventh Circuit noted in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir.1988), the status raises a number of questions whose answers are not apparent from the statutory language, including (1) whether, for a person to be a transfer beneficiary, the transferor must have intended to confer a benefit on that person; (2) whether, to be a transfer beneficiary, a person must have actually received a benefit; and (3) if so, whether the benefit must be quantifiable.[14]

The Seventh Circuit did not answer these questions in *Bonded Financial* because it found that the allegedly benefited person in that case was a subsequent transferee, a status that it found incompatible with that of transfer beneficiary. 838 F.2d at 895.[15] However, the court did describe the "paradigm" transfer beneficiary-a party whose indemnification obligations or whose own debts are extinguished or reduced by the transfer: "someone who receives the benefit but not the money." 838 F.2d at 895. *Bonded Financial* explained:

> Section 550(a)(1) recognizes that debtors often pay money to A for the benefit of B; that B may indeed have arranged for the payment (likely so if B is an insider of the payor); that but for the payment B may have had to make good on the guarantee or pay off his own debt; and accordingly that B should be treated the same way initial recipients are treated.

*Id.* at 896. Following the *Bonded Financial* description and other relevant considerations, it appears that transfer beneficiary status depends on three aspects of the "benefit": (1) it must actually have been received by the beneficiary; (2) it must be quantifiable; and (3) it must be accessible to the beneficiary.

■ *i. Actual benefit.* Some decisions dealing with transfer beneficiary status have stated that the transferor's intent to

---

14. The Seventh Circuit framed these "difficult questions" as follows: "To what extent does 'intent' matter under § 550(a)(1)? If intent matters, whose? To what extent must courts find the true economic benefits of a transaction?" *Id.*

15. Section 550 divides the potential defendants in a fraudulent transfer (or other avoidance action) into three categories: (1) the initial transferee, (2) the transfer beneficiary, and (3) subsequent transferees. Defendants in the first two categories may be required to return the value of the transferred property to the debtor's estate even if the initial transferee provided value in good faith, except to the extent of the value provided. However, subsequent transferees who provide value in good faith are given a complete defense under § 550(b)-and the value they provide need not be equivalent to the property that they receive from an earlier transferee. 5 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 550.03[1] at 550–22 (15th ed. rev.2004) ("The 'value' required to be paid by the secondary transferee is merely consideration sufficient to support a simple contract ...."). *Bonded Financial* explains that this difference reflects the better position of the initial transferee to monitor the propriety of a debtor's transfer. 838 F.2d at 892–93. Because of this difference in treatment, *Bonded Financial* holds that a subsequent transferee cannot be treated as a transfer beneficiary, because this would cause a loss of the more extensive defense.

convey a benefit is sufficient in itself to make the intended beneficiary liable under § 550(a)(1). *See, e.g., Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544, 547 (9th Cir.1991) (citing authority for the proposition that "an entity need not actually benefit, so long as the transfer was *made* for its benefit.") This approach is effectively criticized in Larry Chek & Vernon O. Teofan, *The Identity and Liability of the Entity for Whose Beneath a Transfer Is Made under Section 550(a): An Alternative to the Rorschach Test*, 4 J. Bankr.L. & Prac. 145 (1995). The authors point out that liability based on the transferor's intent alone would contradict the well-established rule that fraudulent transfer recovery is a form of disgorgement, so that no recovery can be had from parties who participated in a fraudulent transfer but did not benefit from it. *Id.* at 169; *see, e.g., Federal Deposit Insurance Corp. v. Porco*, 75 N.Y.2d 840, 841, 552 N.Y.S.2d 910, 911, 552 N.E.2d 158 (1990) (finding no cause of action under New York against a person assisting in a fraudulent transfer); *Mack v. Newton*, 737 F.2d 1343, 1356–57 (5th Cir.1984) (finding no cause of action under Texas law or under the Bankruptcy Act of 1898 for conspiring in a fraudulent transfer).

Moreover, basing transfer beneficiary liability on the mere intent of the transferor creates a potential constitutional problem. As an example of this problem, Chek and Teofan posit a fraudulent transfer of $100,000 from an individual debtor to his attorney, with directions to deposit the money into a trust fund for the debtor's children, followed by an embezzlement of the funds by the attorney. 4 J. Bankr.L. & Prac. at 148. The authors observe that imposing liability on parties like the chil-

dren in this hypothetical—"merely because of the debtor's subjective intent and the trustee's decision to name [them]"—could be seen .as a deprivation of property without due process. *Id.* at 156 & n. 63.

Finally, requiring that a benefit actually be received, not just intended, is consistent with the *Bonded Financial* paradigm-the *receipt* of a benefit without a direct transfer of the debtor's property. 838 F.2d at 895. *Bonded Financial's* example is a transfer to a third party who is owed money by the beneficiary, reducing the beneficiary's liabilities. By like reasoning, transfer beneficiary status would result when a transfer to a third party increases the beneficiary's assets.[16] But either way, an actual benefit rather than a merely intended one must be received in order for the beneficiary to be liable under § 550(a)(1).

■ ii. *Quantifiable benefit.* A corollary to the disgorgement-based requirement that a benefit actually be received is a requirement that it be quantifiable. A merely theoretical benefit is not sufficient, since it would not be subject to disgorgement. This rule was applied in *Telesphere Liquidating Trust v. Galesi*, 246 B.R. 315, 322–23 (N.D.Ill.2000). At issue in *Telesphere* was the transfer to lenders of a security interest in all of an insolvent corporation's property in connection with a leveraged buyout. The plaintiff alleged that this transfer benefited a corporate insider by giving him an opportunity to realize a return on his equity investment that he would not have realized had the corporation been liquidated. The district court acknowledged that "there is an unequal distribution of risk involved when

---

**16.** Thus, for example, an insider of an insolvent corporation might make a transfer of corporate funds to a retailer, for his personal account. If there were a balance owing on the account, the transfer would reduce the insider's liability.to the retailer; if there were nothing owing on the account, the transfer would create a credit balance.

insolvent enterprises engage in high-risk transactions," but pointed out that in fact the leveraged buyout was unsuccessful from the outset, so that the insider never received any actual benefit. *Id.* at 322. The district court accepted the bankruptcy court's application of the "traditional limitation" of transfer beneficiary status to situations of "a particularized quantifiable benefit," rather than expanding the status "to allow recovery for such unquantifiable and uncertain benefits as those at issue here." *Id.* at 323.

■ iii. *Accessible benefit.* The third requirement for transfer beneficiary status—that the benefit be accessible to the beneficiary-also follows from the disgorgement-based requirement of actual receipt. Even if a quantifiable benefit is actually received, it could not fairly be disgorged if the beneficiary never had access to it. For example, an insolvent debtor might transfer property to a corporation that he controls, but that also has minority shareholders. A fraudulent transfer benefits those shareholders in a quantifiable fash-

ion-a share of the value of the transferred property proportionate to their share of the corporation's equity. However, without control of the corporation, they may have no access to this benefit. Of course, if the corporation prospers, the corporation itself can disgorge the value of the property. But if the corporation becomes insolvent, and if it made no distribution to the minority shareholders subsequent to the fraudulent transfer, they would never have had access to the benefit they received, and there would be no basis to require disgorgement of them.[17]

■ In the present case, the trustee has established all of the requirements for transfer beneficiary status. As a result of the transfer to Longview LLC of McCook's right to purchase the Longview assets, Lynch received an actual benefit, his share of the value of the assets; that benefit is quantifiable, as discussed above in connection with the Peltz analysis; and it was accessible, through Lynch's control of Longview LLC.[18]

---

**17.** Chek and Teofan recognize that some limit must be put on transfer beneficiary liability to deal with this sort of situation, and they reject intent of the transferor as the appropriate limiter. "Where the benefit to the defendant is clear, the debtor's intent ought not to matter; the defendant should be required to disgorge the benefit from an avoided fraudulent or preferential transfer." 4 J. Bankr.L. & Prac. at 159. Instead, they suggest that the benefit must be in the form of realized monetary value. "By this means, no defendant is placed in the difficult position of disgorging the value of a theoretical or potential benefit, while the trustee avoids litigating the thorny issue of intent when the court has already found the relevant transfer to be fraudulent or preferential as well as a direct benefit to the defendant." *Id.* at 160. However, if the debtor had access to the transferred property, there is no injustice in requiring the disgorgement of its value, even if the beneficiary chose not to reduce the property to its monetary value. Thus, if an insolvent debtor trans-

ferred junk bonds to a corporation wholly owned by himself, he could properly be required to disgorge the value of the bonds as of the date of the transfer, even if he chose to leave the bonds in the corporation and they later became worthless.

**18.** Even if the analysis of transfer beneficiary set out here were not completely accepted, Lynch would still likely occupy that status. First, if transfer beneficiary status required intent to benefit, that intent was present here: Lynch, as controlling person of McCook, intended to benefit himself in the transfer (as reflected in his providing himself the 56% ownership interest in Longview LLC). Second, if a direct monetary benefit were required, Lynch received such a benefit from the Longview transactions: he obtained $1,487,993 in cash from Longview LLC through salary and payments of his creditors following the transfer of the Longview assets. (See Findings of Fact, *supra* p. 582.)

■ d. *The measure of the value of the transfer.* Since Lynch is a transfer beneficiary, § 550(a)(1) entitles the trustee is to recover from him "the value" of the transferred property. Although the language of this section might reasonably be read to mean the entire value of the property transferred to Longview LLC ($11.1 million), it might also be read to mean the more limited value of that property to Lynch. For the same reasons that counsel against basing transfer beneficiary status merely on the intent to confer a benefit, an award of "value" against a transfer beneficiary should not be based on value that the beneficiary did not receive. It is easy to imagine a situation in which the benefit resulting from a transfer of property is of substantially less value than property itself. Chek and Teofan hypothesize a preferential payment of a $100,000 corporate debt, which the corporation's president has guaranteed to the extent of $25,000. 4 J. Bankr.L. & Prac. at 162–63. The president is benefited by repayment of the debt, but only to the extent of the cancellation of his guarantee. An award of $100,000 would go well beyond disgorgement, and would raise due process concerns. Although it does not provide an analysis to support its result, *Nickless v. Golub (In re Worcester Quality Foods, Inc.)*, 152 B.R. 394, 404–05 (Bankr.D.Mass. 1993), applies the appropriate measure of value in this context, limiting transfer beneficiary liability to the extent of the benefit actually received (brothers who each owned half of a corporation that received a fraudulent transfer were each found liable to pay half of the value of the transferred property).

■ In the present case, the value of the benefit Lynch received was his 56% equity interest in the contract rights transferred to Longview LLC. However, Lynch's equity interest was subordinate to the $7,826,959 note that Longview LLC gave to McCook at the time of the transfer. As noted above (at p. 582), $500,000 of the note was paid at closing, and the financing of that payment was taken into consideration in Peltz's valuation (since Peltz deducted all of Longview LLC's debt service in calculating the value of the transferred property). But the balance of the note was not financed, and was not deducted in Peltz's opinion of value. Lynch's actual benefit, then, should be reduced by the value of the note at the time of the transfer. The note bore interest at prime (then 8.5%), but called for payment 18 months after the closing, during the period of Longview LLC's expected operation under the BPA energy agreement-a period for which Peltz employed a discount rate approximating 50%. A more appropriate discount rate for the note (recognizing its priority over Lynch's equity position but also the uncertainty of Longview LLC's operations under the energy agreement) would be 21%—midway between the 14% rate that Peltz found generally applicable to the aluminum industry and the 28% rate that he found applicable to Longview LLC in a liquidation context. Applying the 21% discount rate to the amount that would have been due on the note at its maturity (with interest at 8.5%) produces a value of the note from Longview LLC at the time of the acquisition of approximately $6.2 million. Subtracting that amount from the $11.1 million value of the Longview assets gives the benefit-$4.9 million-that Lynch shared with the other owner members of Longview LLC. Lynch's 56% share of this benefit is $2,744,000, and this is the value of the transferred property to Lynch, recoverable by the trustee under § 550(a)(1).

■ There is no evidence that Lynch personally provided any value to McCook to obtain this benefit, and so he has no

affirmative defense under § 548(c) reducing the trustee's recovery. Moreover, because the trustee is entitled to recover from Lynch only the value of the benefit that Lynch himself received on account of the Longview assets, there is no basis for reducing the trustee's recovery on account of the $225,000 that the trustee received in settlements with other defendants. The settlement payment does not cause the trustee's total recovery to exceed the value of the transferred property-a result that is prohibited by the "single recovery" rule of § 550(d).

## 2. Conversion

The trustee's claim for conversion (Count IV of the 2002 adversary) is not supported by the evidence. Conversion requires a plaintiff to establish, at the outset, that the defendant has exercised control, dominion, or ownership over the property of the plaintiff without authorization. *Guice v. Sentinel Technologies, Inc.,* 294 Ill.App.3d 97, 228 Ill.Dec. 483, 689 N.E.2d 355, 365 (1997). Far from showing that any of the property interests of McCook were transferred without authorization, the evidence at trial established that the transfers at issue here (of McCook's right to purchase the Longview smelter and the cancellation of the Reynolds Supply Agreement) were authorized by Lynch as chairman and chief executive officer of McCook. (See, *e.g.,* P.Ex. 41, cancellation of the supply contract.) While an authorized transfer may be fraudulent or involve a breach of fiduciary duty, it cannot be the basis for a claim of conversion. *See Mack v. Newton,* 737 F.2d 1343, 1354–55 (5th Cir.1984) (finding no conversion under Texas law in connection with an authorized transfer alleged to be fraudulent).

## 3. Breach of Fiduciary Duty

a. *Nature of the duty; elements of breach.* It is a well-established principle of the common law, which Lynch acknowledges, that when a corporation becomes insolvent, the duties of the corporation's fiduciaries extend to its creditors. *See, e.g., Cate v. Pagel–Clikeman Co.,* 87 Ill.App.2d 65, 230 N.E.2d 387, 390 (1967) (citing authority for the rule that "the directors of an insolvent corporation are trustees for the creditors of the corporation"). The roots of this rule can be traced back more than a century. In *Winger v. Chicago City Bank Trust Co.,* 394 Ill. 94, 67 N.E.2d 265, 275 (1946) the Illinois Supreme Court noted that "[t]he relation of directors of a corporation to its stockholders, towards the corporation, and in many instances towards its creditors, is a fiduciary relationship," and in support of this rule cited its 1898 decision in *Elting v. First National Bank,* 173 Ill. 368, 50 N.E. 1095 (1898). *Elting,* in turn, dealt with the executor of a decedent's estate who engaged in self-dealing with real property of the decedent's estate. The court discussed the applicable legal principles as follows:

> The statute authorizes an ... executor to sell ... real estate in case of the deficiency of personal assets, in order to raise money to pay the debts of the deceased. Necessarily, the ... executor in such case has a double duty to perform. He owes a duty to the heirs to sell the land fairly, and for as much as possible, in order that the surplus out of the proceeds of sale, after paying the debts, shall be as large as possible, inasmuch as such surplus goes to the heirs. But the administrator also owes a duty to the creditors to make a fair sale, in order that such sale, if possible, may realize enough to pay the debts due such creditors. If, by reason of fraud or collusion or other improper conduct, he sells the property to himself, or otherwise so conducts the sale that the credi-

tors fail to realize sufficient to pay their claims, he is guilty of a violation of his trust, as well against the creditors as against the heirs. In such case the creditors are beneficiaries in the trust. Accordingly, we find that the doctrine which forbids a trustee to take advantage of his fiduciary relation to work a wrong to his beneficiary applies to executors and administrators, as well as to other trustees. "The equitable doctrine applies with strictness to executors and administrators, who, in common with all trustees, are prohibited from purchasing the property of the estate, when sold in the course of administration, and from making any personal profits by their dealings with it." 2 Pom. Eq. Jur. § 953.

50 N.E. at 1101. This context, then, gives meaning to the rule that the directors of an insolvent corporation are trustees for its creditors. They owe to the corporation's creditors the same fiduciary duties in dealing with its property that an executor would owe to creditors of a decedent's estate-they may not engage in self-dealing with, or make any personal profit from, the property that they administer. These corporate law principles are fully applicable to managers of insolvent limited liability companies. *See Anest v. Audino,* 332 Ill.App.3d 468, 265 Ill.Dec. 840, 773 N.E.2d 202, 209 (2002) (holding that the fiduciary duties of a corporate shareholder were owed by a member of a limited liability company).

 As a representative of creditors, a bankruptcy trustee may assert creditors' collective claims for breach of duty to a business enterprise in bankruptcy. *See Koch Refining v. Farmers Union Central*

*Exchange, Inc.,* 831 F.2d 1339, 1343, 1348 (7th Cir.1987), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). The trustee here asserts that the transfer of McCook's right to purchase the Longview smelter to a new company owned by its managers, at a time when McCook was insolvent, was a breach of the fiduciary duty that the managers including Lynch, as chairman and chief operating officer owed to McCook's creditors.[19]

More recent Illinois decisions have clearly defined the duties of corporate fiduciaries in the context of opportunities that their corporation might pursue, and these duties would similarly be owed by the managers of a limited liability company. The decisions set out a triple rule: first, that fiduciaries may not pursue an opportunity themselves if their corporation could do so; second, that the question of whether the corporation could pursue the opportunity must be presented to the corporation (individual fiduciaries cannot make that determination on their own); and third, if the fiduciaries actually use the assets of the business to develop the opportunity, they are estopped from asserting that the corporation could not have done so.

All three of these principles are illustrated by the decision in *Levy v. Markal Sales Corp.,* 268 Ill.App.3d 355, 205 Ill. Dec. 599, 643 N.E.2d 1206 (1994). There, the majority shareholders and managers of a corporation that represented sellers of consumer electronics were presented with an opportunity to engage in a new business-representing a computer manufacturer-and they determined to set up a new

---

**19.** The trustee argues that cancellation of the Reynolds supply contract was a separate breach of duty. However, as discussed above, at n. 12, the supply contract would necessarily have been cancelled had McCook acquired the Longview smelter, and so cancellation of the contract cannot give rise to any recovery separate from the right to recover for diversion of the opportunity to acquire the smelter.

business, owned by themselves individually, to pursue this opportunity. In affirming a judgment that the managers had violated their fiduciary duty to the original corporation, the appellate court made these points:

■■■■ (1) A corporation's fiduciaries are prohibited from "taking advantage of business opportunities which are considered as 'belonging' to the corporation." *See Graham v. Mimms*, 111 Ill.App.3d 751, 67 Ill.Dec. 313, 444 N.E.2d 549, 556 (1982), *quoted in Levy*, 643 N.E.2d at 1214. If their conduct in dealing with an opportunity is challenged, the fiduciaries "have the burden of establishing the fairness and propriety of the[ir] transactions." *Shlensky v. South Parkway Building Corp.*, 19 Ill.2d 268, 166 N.E.2d 793, 801 (1960), *quoted in Levy*, 643 N.E.2d at 1214.

■■■ (2) "[W]hen a corporation's fiduciary wants to take advantage of a business opportunity which is in the corporation's line of business ... the fiduciary must first disclose and tender the opportunity to the corporation, notwithstanding the fact that the fiduciary may have believed that the corporation was legally or financially incapable of taking advantage of the opportunity." *Graham*, 444 N.E.2d at 559, *quoted in Levy*, 643 N.E.2d at 1215.

■■■ (3) When a corporation's fiduciaries actually use corporate assets to pursue a business opportunity, they implicitly assert that the project constitutes a corporate opportunity, and therefore, "the fiduciary is estopped from denying that the resulting opportunity belongs to the corporation." *Graham*, 444 N.E.2d at 557, *quoted in Levy*, 643 N.E.2d at 1217.

■■■ Under this reasoning, the trustee has established that Lynch breached a fiduciary duty to the creditors of McCook.

(1) An aluminum smelter was plainly in McCook's "line of business." Indeed, McCook undertook its antitrust action against Alcoa, which led to the acquisition of the Longview smelter, in order to obtain a source of aluminum for its business operations.

(2) Lynch failed to establish that McCook lacked the capacity to acquire the Longview smelter. Lynch points out that McCook could not have acquired the smelter without the consent of GECC, and he argues that GECC denied this consent. However, as discussed above, the most reasonable reading of the evidence in this case is that McCook never asked GECC for its consent to acquire the smelter, and that if it had, GECC would have consented.

(3) Moreover, since Lynch and the other member owners of McCook used McCook's own assets to acquire the smelter, they are estopped in any event from asserting that McCook lacked the capacity to acquire it.

■■■ Lynch also argues that he did not breach any duty to McCook because he disclosed the opportunity to acquire the smelter and the other member owners agreed that a separately owned company should make the acquisition. However, the duty involved here was owed not to the other member owners, but to McCook's creditors. That the other member owners agreed to transfer the Longview opportunity away from McCook makes them jointly and severally liable, with Lynch, for a breach of duty to the creditors; it does not excuse Lynch. *See Cherney v. Soldinger*, 299 Ill.App.3d 1066, 234 Ill.Dec. 65, 702 N.E.2d 231, 236–38 (1998) (fiduciaries who join in a breach of duty are jointly and severally liable).

■■■ Finally, Lynch argues that he did not personally take any opportunity belonging to McCook because Longview

LLC acquired the opportunity. However, Illinois law draws no distinction between fiduciaries who acquire corporate opportunities in their own name and fiduciaries who acquire the opportunities through entities that they own. Indeed, in *Levy v. Markal Sales* the opportunity to represent the computer manufacturer was transferred by the defendant corporate fiduciaries to another corporation that they owned, a circumstance that made no difference to the determination that they had breached their fiduciary duty. 643 N.E.2d at 1211 (noting the defendant's formation of a new corporation to conduct the computer business that they had misappropriated).

b. *The measure of damages.* Illinois law imposes two distinct forms of damages for breach of fiduciary duty in misappropriating a corporate opportunity. First, the injured corporation is entitled to any profits that it lost by not pursuing the opportunity itself. *See Vendo Co. v. Stoner*, 58 Ill.2d 289, 321 N.E.2d 1, 12–13 (1974) (corporation wrongly deprived of the opportunity to own an invention was entitled "to be compensated for the difference between the profits which it could reasonably be expected to [have made] if it had been the owner of the [invention] and the profits which it did in fact earn"). Second, and independent of lost profits, the offending fiduciary must forfeit any benefit received in connection with the breach of duty, so as to eliminate incentive to engage in such activity. *Id.* at 10 (limitation of recovery to lost profits "would mean that a fiduciary could violate his duty without incurring any risk"). Thus, during the time that a fiduciary pursues an opportunity belonging to the injured corporation, any salary received by the fiduciary from that corporation must be forfeited. *Id.* at 14. Moreover, a fiduciary is required to forfeit any proceeds received from the misappropriated opportunity in excess of reasonable compensation due for developing the opportunity. *See Graham v. Mimms*, 111 Ill.App.3d 751, 67 Ill.Dec. 313, 444 N.E.2d 549, 560 (1982) (remanding for determination of reasonable compensation). Finally, in an appropriate case of breach of fiduciary duty, punitive damages may be awarded. *Levy*, 643 N.E.2d at 1222–23.

Under these standards, the trustee has established only a right to recover certain benefits received by Lynch. The trustee has not established lost profits on behalf of McCook. Although Longview LLC generated a profit of $2.9 million in 2001, it lost money thereafter and was ultimately liquidated. The trustee made no showing that the Longview assets would have been more profitable in the hands of McCook-indeed, continued high energy prices appear to have made profitable operation of aluminum smelters impossible in the Pacific Northwest. Thus, had McCook acquired the Longview assets for its $7.8 million investment in the antitrust litigation and due diligence, the $2.9 million profit in 2001 would likely have been the only profit it would have received. McCook actually received more than $6 million from Longview LLC in payments on the note intended to repay McCook's investment. Hence, no profit was lost.[20]

---

**20.** As reflected in this analysis, the measure of damages for misappropriation of a business opportunity differs from damages for a fraudulent conveyance. The lost profit analysis for misappropriation attempts to reconstruct what would actually have happened had the opportunity been developed by the injured business entity. Thus, actual historical events following the misappropriation are highly relevant. *See Vendo*, 321 N.E.2d at 13 (considering actual performance of the business employing a misappropriated invention). With a fraudulent transfer, by contrast, the value of the transferred property is measured as of the time of the transfer, based on facts then known, rather than later occurrences. *See*

■ Nor is the trustee entitled to punitive damages. There has been no showing here of egregious circumstances, such as the "underhanded, deceitful and sly" conduct that gave rise to punitive damages in *Levy*. 643 N.E.2d at 1223. To the contrary, Lynch made at least some effort to compensate McCook for the appropriation of its right to purchase the Longview assets by having Longview LLC issue its promissory note to McCook, and Longview LLC made substantial payments on the note while Lynch controlled the company.

■ However, the trustee is entitled to a return of benefits received by Lynch in connection with the Longview opportunity. First, Lynch received a minimum of $150,000 in salary from McCook while he was managing Longview LLC in violation of his fiduciary duty to McCook's creditors.[21] Second, as noted above, Lynch received benefits totaling $1,487,993 from Longview LLC itself. No evidence was introduced to show what portion of these benefits would constitute reasonable compensation for services that Lynch provided to Longview LLC. The burden of producing such evidence was on the fiduciary.[22] Therefore, the entire amount of the benefits received by Lynch from Longview LLC must be forfeited. The combination of forfeited salary from McCook and for-

feited benefits from Longview LLC is $1,637,993.

### 4. Disallowance

■ The trustee's request for disallowance of any claims that Lynch may have against the McCook estate (Count I of the 2003 Adversary) is based on § 502(d) of the Bankruptcy Code. Section 502(d) provides that the court shall disallow the claim of any entity "from which property is recoverable under section ... 550 ... unless such entity has paid the amount ... for which such entity ... is liable under section ... 550." As discussed above, Lynch is liable to pay the trustee the value of the right to purchase the Longview assets, pursuant to § 550, and until that payment is made, his claims against the estate must be disallowed.

### 5. Equitable subordination

■ The trustee's remaining claim seeks equitable subordination of any claim that Lynch may be able to assert against the McCook estate (assuming satisfaction of his liability under § 550), pursuant to § 510(c) of the Code. Generally, three conditions must exist in order to equitably subordinate a claim pursuant to § 510(c): the claimant must have engaged in some type of inequitable conduct in connection

*Drewes v. FM Da–Sota Elevator Co. (In re Da–Sota Elevator Co.)*, 939 F.2d 654, 655 n. 2 (8th Cir.1991)

21. Lynch remained on McCook's payroll from February 2001 (when the Longview acquisition closed), until August 2001 (when he resigned from McCook), involving at least six monthly salary payments. His annual salary at the time was $300,000. (Tr. Vol. III at 99; Tr. Vol. IV at 39; Lynch Dep. at 116; P.Ex. 42) Although the evidence suggests that Lynch may have continued to receive a bonus equal to 40 percent of his base salary (as he did prior to the Longview acquisition), there is no definite evidence to this effect. (See P.Ex. 42).

22. The situation here is essentially the same as in an action for an accounting, where "the plaintiff makes a prima facie case by showing a breach of fiduciary duty plus gross receipts resulting to the fiduciary, and the defendant must prove what deductions are appropriate to figure the net profit." 1 Dan B. Dobbs, *Law of Remedies* § 4.3(5) at 610 (2d ed.1993); *see also Kennedy v. Miller*, 221 Ill.App.3d 513, 163 Ill.Dec. 934, 582 N.E.2d 200, 206 (1991) ("If a party seeks credits against the accounting, such party has the burden to prove them.").

with the claim being asserted, the misconduct must have resulted in injury to creditors or conferred unfair advantage on the claimant, and equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. 11 U.S.C. § 510(c); *see In re Lifschultz Fast Freight*, 132 F.3d 339, 344 (7th Cir.1997). Based on the determinations set out above, Lynch is required to pay substantial damages to the estate, including forfeiture of the salary he received while he was working on Longview LLC, and until he does so, he may not pursue any claim against the estate. However, if Lynch has legitimate claims (such as for reimbursement of expenses or unpaid salary for periods when he was not managing Longview LLC), there is no reason why these claims would not be payable pro rata with those of other creditors. The trustee is not entitled to equitable subordination.

### 6. Prejudgment interest

The trustee seeks prejudgment interest. Such an award is granted, on a discretionary basis, "to make the prevailing party whole." *In re Roti*, 271 B.R. 281, 293 (Bankr.N.D.Ill.2002) (noting that prejudgment interest is "simply an ingredient of full compensation," and should not be considered a windfall). The decision whether to award prejudgment interest "involves a balancing of the equities between the parties under the circumstances of the particular case." *Carmel v. River Bank America (In re FBN Food Services, Inc.)*, 185 B.R. 265, 272 (N.D.Ill.1995) *aff'd in relevant part*, 82 F.3d 1387 (7th Cir. 1996). In the present case, the recoveries to the trustee both on his fraudulent transfer claim and on his breach of fiduciary claim are sufficient without an award of prejudgment interest. The first gives the estate the value of the Longview assets at the time of their acquisition, a significant benefit in light of their subsequent decline in value. The second includes all the benefits received by Lynch from Longview LLC, even though some part of those benefits was likely appropriate compensation for his services. Accordingly, awarding prejudgment interest is not necessary to make the McCook estate whole, and the trustee's request for prejudgment interest will be denied.

### Conclusion

For the reasons set forth above, judgment will be entered, by separate order, in favor of the trustee on Counts I through III of the 2002 Adversary in the amount of $2,744,000. Alternatively (not in addition), judgment will be entered in favor of the trustee on Count V in the amount of $1,637,993. Judgment is granted in favor of Lynch with respect to Count IV of the 2002 Adversary. Pending payment of the award on Counts I through III of the 2002 Adversary, any claims of Lynch against the McCook estate are disallowed. Any allowable claims of Lynch will not be subject to equitable subordination based on the matters raised in these proceedings. Prejudgment interest will not be awarded.